**[J-10-2014]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| IN THE INTEREST OF J.B. | : No. 34 WAP 2013 |
| | : |
| | : Appeal from the Order of the Superior |
| APPEAL OF:  COMMONWEALTH OF | : Court entered May 8, 2013 at No. 940 |
| PENNSYLVANIA | : WDA 2012, vacating the Order of the |
| | : Court of Common Pleas of Lawrence |
| | : County entered May 18, 2012 at No. 113 |
| | : of 2011, JUV and remanding. |
| | : |
| | : ARGUED:  March 12, 2014 |

**OPINION**

**MADAME JUSTICE TODD**[*]                              **DECIDED:  DECEMBER 15, 2014**

The Commonwealth appeals from the order of the Superior Court vacating the dispositional order of the Juvenile Court of Lawrence County and remanding this matter to that tribunal for further proceedings.  We hereby vacate the order of the Superior Court, and remand this matter to the juvenile court so that J.B. may be given the opportunity to file a motion for a new adjudication hearing, *nunc pro tunc*, challenging the weight of the evidence supporting his conviction for one count of first-degree murder and one count of homicide of an unborn child.

**I.  Factual Background**

The evidence of record adduced at the adjudication hearing held in this matter established the following facts, which are relevant to the juvenile court's adjudication at issue in this appeal:  During February 2009, C.B. (an adult male), along with his fiancée

_____

[*] This case was reassigned to this author.

— K.M.H ("the victim") — her two daughters, J.H. (age 7) and A.H (age 4), and C.B.'s 11-year-old son J.B. were living together in a two-story rented house. The house was located in a rural area surrounded by farmland and woods, and situated near the town of Wampum, Pennsylvania. During the predawn hours on the morning of Friday, February 20, 2009, C.B. left the house to go to work. According to C.B., it had snowed overnight, and at the time he was leaving — 6:45 a.m. — there was snow on the ground. N.T. Adjudication Hearing, 4/11/12, at 147. C.B. recalled that he departed in his usual fashion by backing his vehicle out of a parking area adjoining the rear of the house and onto the long driveway which led from a combination storage barn and garage complex ("garage") located behind the house to the nearby thoroughfare of Wampum-New Galilee Road ("road").[1] He arrived at work approximately fifteen minutes later at around 7:00 a.m. Id. at 146.

Later that morning, J.B. came downstairs from his upstairs bedroom in the house to get dressed for school. Id. at 68. During this period of time, C.B. and the victim — who was then over 8 months' pregnant — had been in the process of relocating the contents of their shared bedroom on the first floor of their home to J.B.'s upstairs bedroom, attached to which was another smaller bedroom they had previously converted into a nursery for use once their baby was born. N.T. Adjudication Hearing, 4/10/12, at 108; 4/11/12, at 68-69. This shared bedroom was located in the front of the house directly to the right of the front door. N.T. Adjudication Hearing, 4/10/12, at 95.

_____

[1] The front of the house faced the road, and, as viewed from that perspective, the parking area was located immediately behind the house on the left hand side, with the barn situated some distance further back to the left and rear of the house. All locational descriptions hereinafter provided in this opinion proceed from a vantage point of a viewer facing the house from the road.

In preparation for the final move, which was to take place during the upcoming weekend, some of J.B.'s personal belongings, including his clothes, had already been placed downstairs inside of the shared first floor bedroom. N.T. Adjudication Hearing, 4/11/12, 68-69. After awakening, J.B. went downstairs, entered that bedroom, where the victim was sleeping at the time, retrieved his clothes, and got dressed in a nearby bathroom. Id. at 69. After dressing, J.B. sat on the couch with J.H. and watched television. Id. A.H. was still asleep. Id. at 66. J.B. recalled that while he and J.H. were watching television, he heard the victim click her cell phone — either open or shut — which he presumed was her checking the time. Immediately thereafter, the victim called out to them that "they needed to leave or they would be late for the bus." Id. at 70. J.B. and J.H. left the house one or two minutes later, which J.B. estimated was around 8:13-8:14 a.m., since both children normally caught the school bus that transported them to Mohawk Elementary School around 8:12 a.m. every morning. Id. at 89. As J.B. exited the house, he noticed a large black truck parked by the garage.[2] N.T. Adjudication Hearing, 4/11/12, at 65-66.

The driver of the school bus which arrived to pick up the children noted that, when he first saw J.B. and J.H., they had made it a third of the way down the driveway, and were walking toward the road, with J.B. a little bit ahead of J.H. N.T. Adjudication

---

[2]  As the Superior Court noted, the house had four entrances, In re J.B., 69 A.3d 268, 280 n. 11 (Pa. Super. 2013); Trial Exhibits 3, 4, 8, and 29 (photos of the house). C.B. testified that, as was their usual practice, J.B. and J.H. would likely have exited the house through a laundry room door located on the right hand side of the house opposite the driveway. In order to get to the driveway from that exit, a person would have to immediately turn left — and, thus, be facing the garage behind the house — then proceed down a flight of stairs, turn left again, and walk through the parking area between the house and garage. N.T. Adjudication Hearing, 4/11/12, at 156-57. According to C.B., the family never used the front door of the house. Id. at 155, 157-58.

Hearing, 4/10/12, at 152. Once the children saw the school bus, however, the driver recalled they both began to run down the driveway toward the bus with J.B. outpacing J.H. by about ten yards during the run. Id. at 153. As they ran towards the bus, the driver did not notice anything unusual in the way the children were acting, and, at no time while he was watching them, did he observe them leave the driveway, or throw anything. Id. at 154, 156. Once the children got to the bus, they each took their respective assigned seats, as per their normal routine. Id. at 153-54. The bus driver recalled observing nothing out of the ordinary about the children's behavior after they had gotten on the bus and during the time they were being transported to school. Id.

Approximately 45 minutes after the children got on the school bus — shortly after 9:00 a.m. — a six-person work crew from a tree service company arrived at the premises to finish collecting firewood they had cut and collected the previous day from the wooded area located in front of the house. Id. at 13, 19, 29. The crew came in three trucks, with the lead truck driven by the owner of the business — Gary Cable — entering the driveway first. Cable and his workers parked their trucks between the front of the house and the woods line which was also in front of the house, but closer to the road. Cable and his crew remained in that area all day. Id. at 18. Cable remembered that there was a "light" coating of snow at the time on the ground, which he estimated was approximately 1/8-1/4 of an inch in depth. Id. at 20. Cable did not recall seeing any tire tracks in the driveway on his arrival, although he did note that the center of the driveway was "humped up" when he pulled in. Id. at 22, 31.[3]

---

[3] In his testimony at the adjudication hearing, Cable conceded that, based on the amount of snow he observed, had a vehicle been driven on the driveway at 6:45 a.m. it (continued…)

Cable and his crew began working, after which one of his workers came to him and reported seeing the screen door to one of the entrances to the house standing open. Id. at 23. Cable told the worker that he would keep an eye on it. Id. Approximately ten minutes later, Cable noticed the door open again and observed a little girl — A.H. — crying; whereupon, Cable went up to the porch to see what was the matter.[4] A.H. told Cable that "her mother was dead." Id. at 25. Cable called 911 and sent one of his workers — Gary Suhanec — to the end of the driveway to flag down the state police officers who had been dispatched. Cable, without entering the house, attempted to console A.H. by speaking to her through the door, and Cable instructed her to get her blanket from the couch and come over to the door so he could talk to her and keep her calm. Id. at 26-27.

While waiting for the police to arrive, Suhanec called Cable on his cellphone and informed him there were footprints on the driveway. Id. at 37. It was at that point that Cable observed two sets of small footprints in the center of the driveway between "[w]here the tire tracks run on either side of the driveway." Id. at 38, 40. Cable estimated this was approximately 45 minutes after he arrived — around 9:45 a.m. Id. at 36.

---

(…continued)
would "definitely" have left tire tracks. Id. at 32. C.B. also testified at the adjudication hearing that Cable informed him, when they conversed on the evening of February 20, 2009, that one of his employees had seen tire tracks and that C.B. had requested that Cable tell the investigating officers about this. N.T. Adjudication Hearing, 4/11/12, at 153. Cable did not recall any of his employees commenting on the presence of tire tracks. N.T. Adjudication Hearing, 4/10/12, at 39.

[4] It was not clear from the record which entrance the worker and Cable were referring to.

The first state police officers — Troopers Harry Gustafson and Corporal Jeremy Bowser — arrived on the scene at 10:13 a.m. Id. at 43-46. Trooper Gustafson encountered A.H., who was crying, at the front door. He picked her up and then took her into the residence and sat her on the couch to watch television. Upon entering the residence through the front door, he immediately saw the body of the victim lying on her left side on the bed in the bedroom with a "very large" pool of blood by her head and upper shoulders and soaking the sheet beneath. Id. at 49, 71. Troopers Gustafson and Bowser engaged in emergency ventilation measures until paramedics arrived.

During the performance of these resuscitative efforts, the school nurse called the victim's cell phone requesting to speak to her. Trooper Gustafson answered the phone, identified himself, and talked to the nurse, who indicated that J.B. was in her office because he was not feeling well and that he was requesting to come home for the day. Id. at 59-60. Trooper Gustafson asked the nurse to "baby-sit" J.B. until they could make arrangements to have someone pick him up. Id. at 60.

The paramedics arrived at around 10:40 a.m. and began to examine the victim. Id. at 85. During the examination, one of the paramedics noted a gunshot wound to the back of her head. Id. at 81-82. The paramedics could not detect any life signs from the victim, nor any fetal heartbeat. Id. at 81. At this point, other crime scene investigators from the Pennsylvania State Police and the Lawrence County Coroner's Office were sent to the scene, after which the victim and her unborn fetus were pronounced dead. In a short period of time thereafter, state police investigators confirmed that C.B. was at work that morning as he claimed, and, after a gunshot residue test of his hands was

negative, he was quickly eliminated as a suspect. N.T. Adjudication Hearing, 4/11/12, at 63, 82, 138, 147.

One of the state police officers who arrived at the home was Trooper Janice Wilson, who, upon arrival, spoke briefly with A.H. Because A.H. was in a state of shock, she could not provide coherent answers to Trooper Wilson's questions. Id. at 60-61. Trooper Wilson next went to Mohawk Elementary school to interview J.H. and J.B.

Upon arrival at the school — shortly after noon — Trooper Wilson asked to speak to J.B., but was informed he was sleeping in the nurse's office because he had a stomach ache. Id. at 63, 70. Trooper Wilson then spoke with J.H., who initially was distraught because she thought she was in trouble; however, she calmed down after the school guidance counselor informed her she was not. Id. at 64. Trooper Wilson interviewed J.H. for about ten minutes, but recalled that "[s]he really didn't have much to offer about what had happened that morning." Id.[5] J.H. did not testify at the adjudication hearing.

J.B. was then awakened in the nurse's office and brought by his guidance counselor to be interviewed by Trooper Wilson in a nearby conference room. Trooper Wilson did not inform J.B. of the death of the victim, but, instead, asked him who had been present that morning in the house, and he replied that "it was his mom, referring to [the victim], and his two sisters and himself." Id. at 65-66. He noted that his dad had already left for work, and A.H. was asleep and did not wake up before he and J.H. left for school. Id. Trooper Wilson next asked J.B. "if he had seen anyone else around or

---

[5] None of the trooper's interviews were recorded, and her testimony regarding the interviews she conducted was based on two reports prepared 6 days and 13 days after the interviews, respectively. N.T. Adjudication Hearing, 4/11/12, at 106-07.

any vehicles there that day?" Id. J.B. replied that his mom's green van was there which she used to drive A.H. to school, and, also, "that he saw a black large pickup truck parked back by the garage." Id. Trooper Wilson pressed J.B. for details about the truck, since she believed that it possibly belonged to the individual who had killed the victim. Id. Trooper Wilson asked J.B. if the truck was running, and he stated that "he . . . didn't know." Id. Trooper Wilson inquired if J.B. "saw anyone around," and she recalled that he replied no. Id. J.B. remarked the truck was of the same kind that he would usually see when the owner of the farm and another man would be in when they came to feed the cows. Id. at 66-67. Trooper Wilson further queried J.B. about what he had done that morning, and he recounted, as detailed above, his actions of retrieving his clothes, getting dressed and going with J.H. to the bus after the victim's admonition to them to hurry up, and then his first observation of the black truck upon exiting the home. The interview concluded at that point.

Meanwhile, during the late morning and early afternoon hours, the state police began searching for Adam Harvey — the ex-boyfriend of the victim — because he had a history of making threats of violence against her. Id. at 125-26. At this time, the victim, as well as her parents, sister, and brother-in-law had a permanent Protection From Abuse ("PFA") order against Harvey, stemming from an incident which occurred in February 2008. During this incident, Harvey — then living in North Carolina — had called the victim's mother and "threatened to take [her] whole family out." Juvenile's Exhibit B, PFA Order 2/4/2008. Harvey was also the owner of a black Ford F-150 pickup truck. Id. at 222-26. Harvey had returned from North Carolina in late October 2008, and had, within the previous two weeks, received paternity test results showing

that A.H. was not his biological daughter. Id. at 151, 191, 207. Also, at some point during the preceding evening of February 19, 2009, Harvey confronted the victim's parents in a nightclub where he had gone to pick up food — resulting in his ejection from the club. Id. at 126, 150.

Trooper Dominick Caimona was dispatched by his supervisor to find Harvey, who was staying with a family that Trooper Caimona knew — the Klingensmiths, in the City of New Castle. Id. at 220-23. When Trooper Caimona arrived at the Klingensmith residence, he was informed by Thomas Klingensmith that Harvey was residing at an address in Union Township, Lawrence County, and that Klingensmith would show him the address. Klingensmith got into Trooper Caimona's car which proceeded along State Street — the main thoroughfare in Union Township. As the state police cruiser approached the intersection of State Street and Miller Avenue, at around 1:20 p.m. in the afternoon, Klingensmith saw Harvey's black truck at the intersection and pointed it out to Trooper Caimona. Id. at 221, 223, 226. Trooper Caimona parked the police car and walked over to the truck; he asked Harvey to accompany him to the state police barracks to talk with him, and Harvey agreed. Id. at 221.

Trooper Caimona noted that the intersection was located approximately 2 city blocks from the home of Harvey's parents where Harvey was staying. Id. at 222. Trooper Caimona observed that Harvey's truck had a light coating of snow on the hood and roof and that it was dirty, as if it had been driven. Id. at 225. Harvey was taken to the state police barracks and interviewed at around 2:23 p.m. Id. at 139. Harvey provided an alibi, stating that he had been home in the basement of his parents' house since 10:00 p.m. the previous evening, and that the only way out of the house was

through the upstairs floor where his dad was. Id. at 133. Harvey's hands were tested at that time by investigators for the presence of gunshot residue, but none was detected. Id. at 137. Based on his proffered alibi, and the presence of snow on the truck, which, in the investigators' opinion, suggested that it could not have been driven to Wampum — a distance Trooper Caimona estimated to be 8-10 miles — and then back to his home without coming off, Harvey was excluded as a suspect. Id. at 132-33, 223.

Also during the afternoon of February 20, Corporal Andrew Pannelle of the Pennsylvania State Police conducted a visual inspection of the inside of the house. He observed that all of the doors to the house were unlocked, and, also, that the front door had blood on its frame. N.T. Adjudication Hearing, 4/10/12, at 124, 134.[6] Corporal Pannelle, while walking through the first floor of the house, noticed a blue blanket on the floor near the front door, and he seized it because it had a hole in it, which he believed could have been indicative of a shotgun blast. Id. at 127. The blanket was subsequently subjected to microscopic examination and chemical testing and no gunshot residue, or blood, was found on it. N.T. Adjudication Hearing, 4/11/12, at 121-23.

Upon entering the first floor bedroom where the victim's body was found, Corporal Pannelle noted that the television, which sat on top of an armoire located in the right hand side of the room, was turned on. N.T. Adjudication Hearing, 4/10/12, at 102. Observing that the doors to the armoire were closed, he opened them. Id. at 103. Inside the armoire, he saw a locked gun safe on the bottom shelf, which was later

---

[6] Although the blood was sent for forensic testing, no further information was provided at the hearing regarding its origin.

determined to contain two handguns and ammunition. On the top shelf, Corporal Pannelle saw a work helmet and two boxes of shotgun shells — one opened and one closed. Id. at 104. The open box contained 16 unfired "Federal Premium" brand .20 gauge shotgun shells. Id. at 106.

Corporal Pannelle, accompanied by Sergeant Markilinski, also of the Pennsylvania State Police, then proceeded to examine the second floor of the house. Upon entering the front bedroom to the right of the stairwell — J.B.'s bedroom — both troopers noted the presence of six "long guns" partially covered by an orange blanket, which, as observed from the entrance to the bedroom, were standing in the left hand side corner of the room nearest the door, between a dresser and the wall. Id. at 108-09. The butt of one gun — a .30-.30 rifle — was protruding the furthest into the room as it leaned against the wall. To its immediate right was a muzzleloader, and leaning directly against that weapon, on the right-hand side, was a .20 gauge shotgun — a "Harrington and Richardson . . . youth model." Id. at 110-11, 121. Both of these guns, like the other four in the group, were found standing upright against the back of the bedroom wall. Id. at 139. Corporal Pannelle began to remove individual guns from the group, one at a time, and hand them to Sergeant Marklinski for him to examine and determine if they were loaded. Id. at 141.

The first gun removed by Corporal Pannelle was the flintlock rifle, which Sergeant Markilinski examined and noted nothing unusual about it. Id. at 141. The second weapon Corporal Pannelle handed to Sergeant Markilinski was the .20 gauge shotgun. Sergeant Marklinski opened the breech of the shotgun and smelled burnt gunpowder in the breech, which he pointed out to Corporal Pannelle, who also smelled

the odor. Id. at 113. Sergeant Markilinski also observed gunpowder residue in the breech and in the barrel. Id. at 141-42. Both Corporal Pannelle and Sergeant Marklinski testified that, based on their personal experience with firearms, they believed the shotgun had been "freshly" or "recently" fired. Id. at 130-31, 142. However, both acknowledged that they were not offering expert opinions in this regard, and that they could not opine with any degree of scientific certainty exactly when the shotgun had been fired. Id. at 132-33, 143. The .20 gauge shotgun was seized by the troopers and sent for forensic examination. Id. at 147.

Because of the discovery of the shotgun, at 10:00 p.m. on the evening of February 20, Trooper Wilson re-interviewed J.B. at his grandmother's home where he was staying. N.T. Adjudication Hearing, 4/11/12, at 71-72. J.B. had not been informed of the victim's death previously by anyone so, prior to Trooper Wilson speaking with J.B., his father, C.B., took J.B. aside and told him "something bad had happened" and "[the victim] isn't with us anymore, she's in heaven." Id. at 72. Upon hearing this, J.B. became emotional and started crying. Id. Once he had calmed down, Trooper Wilson, along with another trooper, began to question J.B., with his father observing. Trooper Wilson described his demeanor as "low-key" and that he was not nervous, excited, or fidgety. Id. at 87.

Trooper Wilson asked J.B. for more details about the black truck and when he had first seen it. Id. at 73. J.B. recalled that he first saw the truck as he exited the house, when he reached in his pocket to see if he had ice cream money for school, and, in the process, dislodged a mass of fuzz from his pocket which fell to the ground. N.T. Id. at 73. When he bent over to pick it up, it was then he noticed the truck parked by the

garage. Id. Trooper Wilson asked J.B. if J.H. had seen the truck, and he replied that he mentioned it to her but she didn't respond, as he believed she was, at that point, too far ahead of him to hear him. Id. at 74. J.B. also mentioned to Trooper Wilson that, while he was out that afternoon in a vehicle driven by one of his relatives, he observed a white S-10 truck which he said to his relative resembled the truck that was at the farm, except he stated that the truck at the farm was black and larger than the S-10. Id. at 94-95.

J.B. also informed Trooper Wilson that he had seen a person in a white hat ducking over inside the truck he observed at the farm. Trooper Wilson inquired of J.B. why he had not mentioned that when she talked with him that morning, and he explained that when he first glanced at the truck he didn't see anybody. Id. at 75. J.B. also recounted his observation that the lights were on inside of the truck, and when Trooper Wilson stated that he did not tell her that during the first interview, J.B., after hesitating, then described the lights as being "sort of half on." Id. at 75.

Trooper Wilson next asked J.B. if he had any guns, and he informed her that he had a .30-.30 rifle. Id. at 76. Trooper Wilson questioned J.B. as to whether he had a shotgun, and he replied yes. She inquired whether he knew what gauge it was, and he stated that "it was a 20-gauge," and further related that he only shot the gun outside and, also, that he had shot it with his dad last month. Id. at 77, 101. Trooper Wilson asked J.B. if he had fired the gun that morning, and he answered "no." Id. at 101. The interview ended at that point. Id. at 78.

At 3:30 a.m. on the morning of February 21, 2009, state police arrested J.B. at his grandmother's residence and charged him with the murder of the victim and her

unborn fetus.  N.T. Adjudication Hearing, 4/10/12, at 217.[7]  No gunshot residue testing

of J.B.'s hands was ever performed.  When J.B. was arrested, he was wearing a polo

shirt, blue jeans, a brown jacket, and tennis shoes.  Id.  These were the same clothes

J.B. had on when interviewed by Trooper Wilson at his school at noon on February 20.

N.T. Adjudication Hearing, 4/11/12, at 78.

Later during the morning of February 21, after sunrise, a team of state police

officers searched the exterior grounds in the immediate vicinity of J.B.'s residence, and

along its driveway.  N.T. Adjudication Hearing, 4/10/12 at 207, 211.  Sergeant Daniel

Brooks, in the company of several other state police officers, began walking outward

from the porch and down the driveway toward the road.  Just outside of the residence,

adjacent to the porch area, they found a "very rusty" spent shotgun shell.  Id. at 199,

202.  As the officers walked further down the driveway in the direction of the road, they

discovered a second spent shell.  This shell — a "Federal Number 6" brand .20 gauge

---

[7]  Although only 11 years old, J.B. was charged as an adult, and he subsequently filed a decertification petition to transfer his case to the Juvenile Division of the Court of Common Pleas of Lawrence County.  The trial court — Judge Dominick Motto — denied the petition on the grounds that, since J.B. consistently denied having committed the crimes with which he was charged during interviews with psychological experts, he had, in the court's view, not taken responsibility for his actions; therefore, based on these denials of culpability, the trial court reasoned that J.B.'s "prospects of rehabilitation [were] . . . likely to be unsuccessful."  Commonwealth v. Brown, 26 A.3d 485, 490 (Pa. Super. 2011).  J.B. was granted permission for an interlocutory appeal of Judge Motto's order, and the Superior Court vacated it.  The Superior Court held that requiring J.B. to accept responsibility for the conduct he was alleged to have committed in order to obtain decertification would require him to effectively admit his guilt of the particular offenses charged, and, thus, violated his Fifth Amendment right against compulsory self-incrimination.  See id.  Consequently, the court remanded for a new decertification hearing, which, after the recusal of Judge Motto, was held before Judge John Hodge of the Court of Common Pleas of Lawrence County.  Judge Hodge granted the decertification petition and presided over the adjudication and dispositional hearings held thereafter.

— was found approximately 100 feet away from the house on the left hand side of the driveway at the beginning of a fence line that ran the entire length of the left side of the driveway. Id. at 195-96, 198, 210. The spent shell was located near the base of the wire fence, a few feet from the middle of the driveway, and it was lying underneath leaves which were frozen and covered by ice and snow. Id. at 210. When asked by the prosecutor at the adjudication hearing[8] to describe the condition of the shell — on a sliding scale ranging from "pristine to the other spectrum being rusted and broken up" — Sergeant Brooks characterized the shell as pristine, and he agreed with the prosecutor that it was not weathered. Id. at 201-02.

Further along the driveway near the road, and embedded in the dirt of the driveway itself, the searching officers found a third spent shell which, like the shell found near the house, was "very rusty," and it was also physically crushed into the surface of the driveway. Id. at 204. In Sergeant Brooks' view, both rusty shells had been there "for quite some time." Id. at 199. However, Sergeant Brooks also opined that there was no way to estimate exactly how long any of the three shells had been lying outside. Id. at 209. These three spent shells were the only ones found during the troopers' search of the property, and, after being photographed in their original positions, they were collected as evidence. Id. at 205, 207.

At the adjudication hearing, the Commonwealth presented the testimony of Dr. James Smith — a forensic pathologist — as to the nature of the victim's gunshot

---

[8] Because of a conflict of interest recognized by the current District Attorney of Lawrence County — Joshua Lamancusa — the Office of the Pennsylvania Attorney General took over the prosecution and currently represents the Commonwealth in this appeal.

wound.[9]  Dr. Smith noted that he determined that the victim sustained a single gunshot wound to the back of her neck, which, because of the presence of shotgun pellets in and around the wound, he opined was inflicted by a shotgun.  N.T. Adjudication Hearing, 4/10/12 at 161.  Dr. Smith described this wound as being in the shape of "a large oval or ellipse" and "tangential," i.e., slanted.  Id. at 160-61.  Due to the trajectory of the wound — proceeding "slightly" from the back of the victim's body to the front and upward — Dr. Smith believed it had been inflicted as the victim was lying on her left side on the bed.  Id. at 161, 179.

Dr. Smith further noted that hot gas from the shotgun blast entered the wound through the skin and muscle of the victim's neck and caused the skin to bulge out and rupture near the point of entry.  Id. at 168.  This phenomenon, known as "blowback," formed a "tract" or laceration in the skin.  Id.  To Dr. Smith, the nature of this type of damage indicated that the gas from the shotgun blast was mostly contained within the entry wound and did not have time to dissipate.  Id. at 168-69.  This factor, coupled with the presence of powder in the wound and "soot" around the surface of the skin near the point at which the pellets entered the skin, caused him to conclude that the shotgun was "very, very close to, or maybe even touching, the back of the neck" when it was fired.  Id. at 168, 183-85.  Although he could not give a precise distance, he estimated the shot was fired from a distance of closer than two inches from the victim's neck, and the barrel of the gun was in "close contact" with her skin at the time.  Id. at 185.

Dr. Smith found that, as the pellets entered the soft tissues of the neck, a small portion of the pellets discharged a piece of bone from the occipital (rear) region of the

---

[9]  No forensic expert was called by J.B.'s counsel to testify on his behalf.

victim's skull near its base, and then entered the interior of her cranial cavity. Id. at 161-62. In his estimation, these pellets caused damage to the centers of the victim's brain which controlled her autonomic nervous functions, thereby causing the death of both the victim and, because of the cessation of the victim's blood circulation, her unborn fetus. Id. at 160-61, 165; 173-78. Dr. Smith noted, however, that the vast majority of the pellets he observed had "rebounded back downward" and traveled back in the direction from which they had entered, resulting in them becoming lodged in the back of the victim's neck. Id. at 162.

Regarding the question of whether the blowback which occurred near the entry wound could have caused blood or other tissue material to travel backwards along the track of the pellets and enter the barrel of the shotgun, Dr. Smith opined that, generally, blowback is more common whenever hot gas from a gunshot wound penetrates beneath the skin and encounters bone which does not yield. Id. at 190-91. Dr. Smith acknowledged that the shot which entered the victim's wound impacted the bones of her skull. Id. at 191. Dr. Smith agreed that it was, therefore, possible that this impact could have caused tissue and blood to have been propelled back through the channel created by the shot and into the barrel of the gun; however, he believed the angle of the gun at the time the wound was made minimized the amount of blowback, and, thus, he opined that one would not expect to find as much blood or tissue as would be present if the wound was inflicted straight into the skin, i.e., with the gun barrel held at a 90 degree angle thereto. Id. at 170-72, 186-92.

Also testifying at the adjudication hearing on behalf of the Commonwealth was a certified toolmark and firearm examiner — Trooper Paul Burlingame of the

Pennsylvania State Police. Trooper Burlingame examined the .20 gauge shotgun seized from J.B.'s residence. After test firing the shotgun, and subjecting it to a "shock and drop" test, he determined that the weapon was not malfunctioning. N.T. Adjudication Hearing, 4/11/12 at 40. Trooper Burlingame related that he also compared the 27 shotgun pellets and pieces of wadding recovered from the body of the victim with pellets from one of the unspent .20 gauge Federal No. 6 brand shotgun shells found in the armoire of the victim's bedroom.[10] Trooper Burlingame noted that pellets and wadding discharged from smooth bore shotguns, like the .20 gauge recovered from J.B.'s bedroom, do not have any marks on them which would make them generally usable for conducting an individual examination. Id. at 40, 47.[11] Trooper Burlingame, therefore, could not perform an individual examination of the pellets recovered from the victim and the pellets in the unfired .20 gauge shells taken from the armoire. He did note, though, that the 27 shotgun pellets recovered from the victim were "consistent" in size, shape, weight, material,[12] and construction with the pellets in the unfired shells,

---

[10] Shotgun shell wadding is normally constructed of either plastic or fiber material, and Trooper Burlingame explained that there are normally two areas in which wadding is found in every shotgun shell: "an over-powder post-type wad" which covers the powder in the shell and a "cup wad" which holds the shot itself. N.T. Adjudication Hearing, 4/11/12, at 45.

[11] Trooper Burlingame described the process of individual examination as using a comparison microscope to examine, side by side, an article of discharged ammunition recovered from a crime scene and an article of discharged ammunition test fired from a particular gun, in order to determine whether the tool markings on each article of discharged ammunition, uniquely produced by every individual gun manufactured, match. Id. at 42-43.

[12] It does not appear from the record that Trooper Burlingame conducted any comparative metallurgical analysis of the shot recovered from the victim and the shot contained within the unspent shells, but only a comparison of their exterior characteristics.

and, also, that the pieces of wadding taken from the body of the victim were "consistent" with the type of wadding in the unfired .20 gauge shells. Id. at 45. Trooper Burlingame also testified that markings created by the manufacturing process, which were found on the discharged shotgun shell recovered from along the fence line of the driveway, were the same as the markings on the unfired .20 gauge shells in the armoire. Id. at 44. This led to his conclusion that the discharged shell had been fired from the .20 gauge shotgun taken from J.B.'s bedroom. Id. at 44, 47.

Additionally, Elana Somple, the manager of the forensic science department of R.J. Lee Laboratory — a materials testing laboratory — testified at the adjudication hearing regarding the results of her testing of the shirt and pants J.B. was wearing at the time of his arrest for the presence of gunshot residue.[13] Ms. Somple explained that, whenever a firearm is discharged, the firing pin impacts with the primer cap of the ammunition loaded in the firearm, which causes the chemical elements therein — lead, barium, and antimony — to ignite, and this force of ignition propels the bullet or projectile in the ammunition out of the front of the muzzle of the gun. Id. at 8-9. According to Ms. Somple, the rapid ignition of these 3 elements after the impact of the firing pin with the primer cap causes them to vaporize and form a plume, or cloud, around the firearm. Id. at 9. Eventually, the airborne particles in the cloud coalesce and land on areas immediately surrounding the firearm, such as the shooter's hands or clothes. Id. Ms. Somple noted that whenever a particle is found with all 3 elements of

---

[13] The then-District Attorney of Lawrence County — John Bongivengo — elected not to have R.J. Lee Laboratories test J.B.'s coat and shoes for gunshot residue. N.T. 4/11/12 at 136.

lead, barium, and antimony fused together, it can be said with scientific certainty that the particle is gunshot residue produced from the discharge of a firearm. Id. at 9-10.

Ms. Semple described how she dabbed both sides of the front of J.B.'s shirt and the front of his jeans with double-sided sticky tape and then examined the particles lifted by the tape under a scanning electron microscope. Her examination revealed one particle of gunshot residue on the right side of J.B.'s shirt and one particle of gunshot residue on the left leg of his jeans. Id. at 16-17. Ms. Semple could not pinpoint which specific area on each article of clothing that the individual particles were found. Id. at 16. She also opined that the particles could have gotten onto the clothing in one of three separate ways: "[t]he person could have discharged the firearm[;] or been in close proximity to somebody else who discharged a firearm[;] or they came into contact with something that had gunshot residue on it." Id. at 21. Ms. Semple further related that such particles can have an enduring presence on articles of clothing, noting: "If I discharged a firearm and took my clothes off, put them in the corner of my room and they were undisturbed for a month, two months, a year, and then tested those clothes, you could still find gunshot residue on them." Id. at 23. By contrast, she explained that a person who discharged a firearm and then went about his or her daily activities would have any gunshot residue on his or her hands removed by those activities. Id. at 13. Ms. Semple additionally related, "[a]s a rule of thumb," that she would expect to see more particles of gunshot residue deposited on someone who fired a gun inside of a house, where there is no airflow, than someone who fired a gun outside where the wind could affect the deposition of the particles. Id. at 27-28.

Corporal Jeffrey Martin of the Pennsylvania State Police testified at the adjudication hearing regarding the results of other forensic tests performed on J.B.'s clothing, the spent shotgun shell found along the fence on the left-hand side of the property surrounding J.B.'s home, and the .20 gauge shotgun taken from the residence. Corporal Martin testified that J.B.'s jacket, shirt, jeans and sneakers seized the morning of his arrest were all tested for the presence of blood stains, and no such stains were found. Id. at 123-24. No fingerprints or DNA material were found on the spent shotgun shell. Forensic examination of the shotgun itself revealed no latent fingerprints on the weapon, and no blood was detected in the interior of the shotgun barrel, on the exterior of the barrel, or on the frame of the shotgun. Id. at 122.

C.B. testified at the adjudication hearing that he, the victim, J.B., and her daughters all had a close relationship and that J.B.'s relationship with the victim was "[j]ust as normal as it was between her and her own daughters." Id. at 141. With respect to the use of firearms on the property, C.B. related that he would quite frequently shoot guns in the area of the property located in front of the house near where the work crew parked on the morning of February 20, 2009. Id. at 142. C.B. also described his and J.B.'s participation in a turkey shoot at an indoor shooting range on Saturday, February 14, 2012 — less than a week before the .20 gauge shotgun was seized. Id. at 143, 182-83. C.B. recalled that J.B. used the .20 gauge shotgun in the turkey shoot and that he loaded and unloaded the shotgun for J.B. each time it was fired. Id. at 145.[14] C.B. also recounted that, because it was a cold winter evening, and

_____

[14] Trooper Wilson confirmed J.B.'s participation in the "turkey shoot" with the .20 gauge shotgun. N.T. Adjudication Hearing, 4/11/12, at 102.

the shoot took place in a large garage like structure, J.B. was wearing his winter coat during the entirety of the shoot, which was the same coat he was wearing on the day of his arrest. Id. at 146.

C.B. further testified that he and the victim chose to have an unlisted phone number at their house in order to ensure that Adam Harvey could not contact them. Id. at 149. C.B. related that he listened to 10-12 voicemails Harvey had left on the victim's cellphone, in which Harvey threatened the victim and her family, and that the victim feared Harvey. Id. at 149, 177. C.B. had no personal knowledge of whether Harvey knew where he and the victim lived. Id. at 174.

Adam Harvey testified at the adjudication hearing as well. He denied making threatening phone calls to the victim and denied the averments in the victim's PFA petition which led to the entry of the PFA order against him. Id. at 200-01. Harvey also stated that he was not upset about the blood test results which showed he was not the father of A.H. Id. at 207. Harvey admitted seeing the victim's parents on the evening of February 19, 2009, as he was walking out of a nightclub while picking up an order of chicken wings, and that he was told to leave. Id. at 208. Harvey claimed that he went home thereafter to his parents' house, where he was living in the basement, which was accessible through a side door on the upstairs floor. He denied going out at all on the night of February 20, and he stated that he did not leave his parent's home until somewhere around 9:00 the next morning to return an automotive part to a store. Id. at 211-12. Harvey disavowed knowing where the victim was living, although he acknowledged having told the state police that people had previously informed him she was living "somewhere in Wampum." Id. at 210.

## II. Procedural History

On April 12, 2012, the juvenile court entertained oral argument from counsel for J.B. and the Commonwealth regarding the evidence adduced at the adjudication hearing. The following day, April 13, 2012, the juvenile court — pursuant to Pa.R.J.C.P. 408(A) — issued written findings of fact adjudicating J.B. delinquent of the charge of criminal homicide, 18 Pa.C.S.A. 2501(a), for the death of the victim, and delinquent of the charge of criminal homicide of an unborn child, 18 Pa.C.S.A. 2603(a), for the death of the unborn fetus.

Thereafter, on April 20, 2012, the juvenile court filed an opinion supplementing the previous findings of fact and conclusions of law it made in support of its delinquency adjudication. In this opinion, the court cited as a reason for determining that J.B. committed the killing the fact that the .20 gauge shotgun taken from J.B.'s upstairs bedroom was "established to be the murder weapon." Trial Court Opinion, 4/20/12, at 12. The court also noted that the clothing which J.B. was wearing when he left for school "had gunshot residue on the right side of his shirt and the left side of his jeans." Id. at 12-13.

The court gave the following reasons for excluding Adam Harvey as a suspect: its finding that "[t]he Pennsylvania State Police promptly located Adam Harvey on the morning of February 20, 2009;"[15] when the police stopped him near his parents' house

---

[15] As stated earlier in this opinion, Trooper Caimona testified that he pulled Harvey over at 1:20 p.m. in the **afternoon** of February 20, 2009, which he noted in his report. N.T. Adjudication Hearing, 4/11/12, at 221, 223, 226.

"the hood and roof of his vehicle were covered with snow and the engine was cold;"[16] the lack of gunshot residue on Harvey's hands; and his averment that he did not know where the victim lived, coupled with the fact that there was no other evidence presented to establish that he had such knowledge. Id. at 13.

The court also found there was a lack of evidence suggesting anyone else entered the residence on the morning of February 20, 2009. The court found that "[t]he only imprints observed in the snow on that morning were the children's footprints leading from the house to the bus stop. There was no indication that another person approached the residence, either by foot or in a vehicle after the children left and before Mr. Cable arrived with his employees." Id. at 14. The court stated that it "especially consider[ed] the absence of any unaccounted for footprints or tire tracks around the home." Id. at 15. The court also relied on "the time period after the arrival of Steve Cable and his tree service employees, during which time no one was seen approaching or leaving the residence, and the forensic testimony of Dr. James Smith, Elana Somple and David Burlingame." Id. The court determined that, based on all of this evidence, the Commonwealth had proved its case beyond a reasonable doubt.

The juvenile court held a dispositional hearing on May 18, 2012, after which it committed J.B. to a secured residential treatment facility. The commitment order stated that J.B. had the right to file a post-dispositional motion within 10 days, but, tracking the language of Pa.R.J.C.P. 620(A)(2),[17] also stated that "[i]ssues raised before and during

---

[16] Harvey testified that he had warmed his truck up before leaving his parents' house. N.T. Adjudication Hearing, 4/11/12, at 213, and Trooper Caimona did not offer any opinion as to the temperature of its engine at the time he pulled the truck over.
[17] Rule 620 provides:
(continued…)

adjudication shall be preserved for appeal whether or not you elect to file a post-dispositional motion." Juvenile Court Order, 5/18/12, at 3 ¶ 16. J.B. did not file a post-dispositional motion.

Instead, J.B. filed a notice of appeal from the dispositional order, following which the juvenile court directed J.B. to prepare and file a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). J.B. timely lodged his statement of matters complained of on appeal with the juvenile court, in which he alleged that the adjudication of his delinquency was against the weight of the evidence for the following reasons:

> (1) The lack of forensic evidence indicating that a .20 gauge shotgun recovered from J.B.'s family home was, in fact, the murder weapon used to kill the victim;
>
> (2) The absence of any forensic evidence indicating that J.B. either handled or fired the .20 gauge shotgun the morning of the murder inside the family home;
>
> (3) The fact that no blood or tissue residue was found on J.B.'s person or clothing after forensic examination thereof;
>
> (4) The fact that only two particles of gunshot residue were discovered on J.B.'s clothing after forensic examination — one on the right side of his shirt and the other on the left side

---

(…continued)
**Rule 620. Post-Dispositional Motions**
**A. Optional Post-Dispositional Motion.**
(1) The parties shall have the right to make a post-dispositional motion. All requests for relief from the court shall be stated with specificity and particularity, and shall be consolidated in the post-dispositional motion.
(2) Issues raised before or during the adjudicatory hearing shall be deemed preserved for appeal whether or not the party elects to file a post-dispositional motion on those issues.
Pa.R.J.C.P. 620.

of his jeans — regarding which the forensic analyst testified "[were] likely and possibly the result of transference; that it was likely that much more extensive residue would have been found on the clothing had a shotgun been discharged indoors, rather than outdoors; and that particles of gunshot residue can stay on . . . clothing for weeks or even months;"

(5) The juvenile court placed undue emphasis in its adjudication regarding the absence of observations of tire tracks and footprints in snow around the victim's home that morning, as neither law enforcement personnel nor employees of a tree cutting service which was on the property the morning of the murder "looked for or placed any significance whatsoever on footprints or tire tracks;"

(6) The juvenile court ignored the following uncontradicted evidence of record adduced at the delinquency hearing regarding the timeline of events in the family home on the morning of the murder which, according to J.B., demonstrated that he lacked sufficient time or opportunity to have committed it:

> [B]oth children were hurriedly getting ready for school; that the victim called out from her bedroom for the children to hurry up because the bus was going to be coming; that, soon thereafter, at approximately 8:15 a.m., they both left the house and ran off to catch the school bus; that nothing out of the ordinary happened that morning before their departure; and that (per the testimony of the bus driver), they behaved as they normally did during the bus ride to school. . . . Nevertheless the court essentially concluded that, before departing for the bus, J.B. went upstairs to his bedroom, retrieved his shotgun, came downstairs, went into the bedroom where the victim was lying on her bed, opened an armoire and retrieved a box of ammunition, loaded his shotgun and shot his father's fiancée in the back of her head at near contact range, exited from the bedroom, went back upstairs, replaced his gun

and then ran off with the victim's 7 year old
daughter to catch the school bus.

Concise Statement of Errors Complained of on Appeal, 8/2/12, at 1-3.

The juvenile court did not find J.B.'s weight of the evidence claim waived due to his failure to file a post-dispositional motion. Instead, the juvenile court ruled that J.B.'s weight of the evidence claim had been "adequately addressed . . . in its Findings of Fact and Conclusions of Law issued on April 13, 2012 and supplemental Opinion issued on April 20, 2012." Juvenile Court Order, 8/8/12, at 1.

In its comprehensive and well-written opinion adjudicating J.B.'s direct appeal, In re J.B., 69 A.3d 268 (Pa. Super. 2013), the Superior Court first considered the Commonwealth's claim that J.B.'s weight of the evidence claim was waived due to J.B.'s failure to raise it in a post-dispositional motion. The court acknowledged its prior precedent of In re R.N., 951 A.2d 363 (Pa. Super. 2008) (holding that juvenile had failed to preserve his weight of the evidence claim for appellate review since he did not raise it at any point during the adjudication or dispositional hearings); however, the court noted that case was decided prior to our Court's promulgation of Pa.R.J.C.P. 620, and, thus, the application of that rule was not considered therein.

Further, the court noted that, in its view, our Court's decision in the case of In re D.S., 39 A.3d 968 (Pa. 2012) — in which we declined to find appellate waiver of a juvenile's sufficiency of the evidence challenge whenever he failed to file an optional post-dispositional motion under Pa.R.J.C.P. 620 — "calls into question the continued validity of R.N. to such an extent that we do not believe R.N. remains good law." In re J.B., 69 A.3d at 275. The court highlighted the three reasons proffered by our Court in In re D.S. for refusing to find waiver of the juvenile's sufficiency claim: (1) Pa.R.J.C.P.

620 makes the filing of post-dispositional motions optional; thus, a juvenile should not be sanctioned for failing to file such an optional motion raising an appellate issue; (2) juvenile defendants cannot seek relief for waived claims under the Post Conviction Relief Act ("PCRA");[18] and (3) the juvenile court may provide its analysis of the sufficiency claim in its Pa.R.A.P. 1925(a) opinion, which an appellate court can review *de novo*, as such a claim involves a pure question of law. The court found these reasons applied equally to preclude it from finding that J.B.'s weight of the evidence claim was waived.

The court explained that, while Pa.R.Crim.P. 607(a)[19] specifies that weight of the evidence claims in criminal proceedings are waived unless they are raised with the trial court in a motion for a new trial, the Pennsylvania Rules of Juvenile Procedure have no counterpart requiring the same manner of preservation. The court found that the only other rule of procedure which could possibly apply to render J.B.'s claim waived was Pa.R.A.P. 302(a), which provides that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). The court, however, refused to apply this rule as it regarded such application to be "a sanction against the juvenile defendant for the failure to file an optional post-adjudication motion," which the court deemed our In re D.S. decision to prohibit. In re J.B., 69 A.3d at 276.

The court further determined that, if it found J.B.'s weight claim waived due to his counsel's failure to preserve it, he would have no recourse to seek PCRA relief, which would be a harsher result than that faced by an adult criminal defendant whose weight

---

[18] 42 Pa.C.S.A. §§ 9541-9546.
[19] See infra at p. 40.

claim was waived on direct appeal for the same reason. Next, the court found that the juvenile court "addressed J.B.'s weight of the evidence arguments in its Pa.R.A.P. 1925(a) opinion," by incorporating, in that opinion, its prior findings of fact from its order of April 13, 2012 and its reasons for adjudicating J.B. delinquent, set forth in its opinion of April 20, 2012. In re J.B., 69 A.3d at 276. Thus, the court perceived no obstacle to its review of the weight of the evidence claim. Lastly, to the extent that the court considered In re R.N. to have any continuing viability after In re D.S., the court distinguished that decision, noting that, in that case, the juvenile did not raise any defenses or arguments at the adjudication hearing, whereas the court found that, by contrast, J.B., in his closing argument to the juvenile court, "presented precisely the same arguments . . . that he now asserts on appeal in support of his weight of the evidence claim." Id. Consequently, the court reasoned that, because J.B. had raised these arguments before the juvenile court, Rule 620(A)(2) did not require him to raise them again in a post-dispositional motion.

The court proceeded to review, on the merits, J.B.'s claim that his adjudication was against the weight of the evidence. The court, relying primarily on our decision in Commonwealth v. Clay, 64 A.3d 1049 (Pa. 2013), confined its review to examining the evidence in the certified record to determine whether it supported certain findings of fact made by the juvenile court relied upon in its adjudication, or whether the juvenile court abused its discretion. The court first determined that the juvenile court's finding of fact that no other person approached the residence due to the "absence of any unaccounted for foot prints or tire tracks around the home" was not supported by the evidence of record introduced at the adjudicatory hearing. In re J.B., 69 A.3d at 279. The court

noted that the testimony of Gary Cable regarding any imprints in the snow that he saw was confined to his observations of the two sets of small footprints in the middle of the driveway, and that he did not provide any other testimony regarding observing imprints in the snow anywhere else on the property. The court further observed:

> No witness (including any of the police officers first arriving on the scene) testified to observing an absence of footprints on the property that morning, on any side of the residence, or at or around any of its four entrances. No witness even testified to making an attempt to look for footprints in the snow (or the absence of the same), and no photographs of undisturbed snow anywhere on the property (including at either of the entrances to the residence) were entered into evidence. In point of fact, other than Cable's unremarkable testimony regarding the children's footprints in the driveway, the record on appeal in this case does not establish any basis for any finding regarding the presence or absence of footprints in the snow anywhere on the property.

Id. at 280. Thus, the court held that the juvenile court's finding of fact that no person entered the residence on the morning of February 20, 2009 until after the victims' body was discovered was erroneous and should be disregarded. Id.

The court next examined the evidence of record to determine if it supported the trial court's conclusion that "no one was seen approaching or leaving the residence" after Cable and his employees arrived at around 9:00 a.m. Id. The Court concluded that the record did not support this finding either, as neither Cable, nor any other witness, provided evidence on this issue. To the contrary, the evidence established that Cable and his work crew remained at all times in the area between the edge of the woods and the front of the house, and he did not testify as to whether he could see all four of the entrances to the home from the time he came onto the property until the arrival of the police. Also, the court emphasized that "[t]he Commonwealth presented

no evidence to establish whether or not anybody entered or exited the residence during [the] 45 minute span from 8:15 a.m. until approximately 9:00 a.m." when Cable arrived. Id. at 281 (parentheses omitted).

The court observed that the juvenile court relied on these findings of fact to conclude that "the Commonwealth's evidence precluded the possibility that someone could have approached the residence on the morning of February 20, 2009 and killed [the victim] and her unborn child." Id. Hence, these findings of fact played a substantial part in the juvenile court's decision that J.B. committed the homicides for which he was charged. Id. In the court's view, because these findings lacked support in the record, the juvenile court "committed a palpable abuse of discretion in rendering a ruling that is plainly contrary to the evidence." Id. Accordingly, the court vacated the dispositional order and remanded for further proceedings.

The court did not address whether the remaining evidence of record was of adequate weight to sustain the juvenile court's finding that J.B. committed the killings. The court stated, in this regard, "[w]e do not know and cannot speculate whether the remaining evidence would support the finding or, instead, shock the conscience of the juvenile court. Thus, our review ends because counsel for J.B. has not asserted a sufficiency of the evidence claim on appeal." Id.

After the Commonwealth sought review from our Court, we granted allowance of appeal to consider the following three questions:

> (1) Did the Superior Court's holding that the law of waiver does not apply to the failure to file a post-dispositional motion seeking a new adjudication hearing based on the weight of the evidence contradict a prior holding of a panel of the Superior Court that may not be overturned by a

subsequent panel, based on a holding of this court that does not apply to the circumstances of this case?

(2) Is a closing argument not an acceptable substitute for a post-dispositional motion for a new adjudication hearing based on the weight of the evidence because the purposes of each event vary and because the standard of review requires a motion?

(3) Does the record supports [sic] the juvenile court's ultimate conclusion that no other persons were present in the house where the crime occurred and that J.B. was the person who committed the delinquent act, such that the verdict does not shock one's sense of justice?

In re J.B., 83 A.3d 408 (Pa. 2013).

### III. Arguments of the Parties

Because we find the first two issues dispositive, we begin by briefly recounting the arguments of the parties with respect thereto. The Commonwealth first argues that the panel below improperly found In re R.N. to no longer be good law and thereby purported to overrule it, which, as a panel of the Superior Court, it could not do as one panel of that tribunal cannot overrule another panel. The Commonwealth asserts that, under In re R.N., a juvenile is required to raise an issue before the juvenile court, or it is waived for appeal. The Commonwealth posits that our Court's decision in In re D.S. did not overrule In re R.N. since In re D.S. dealt with the issue of the proper preservation of a sufficiency of the evidence claim, not a weight one.  Thus, the Commonwealth reasons In re R.N. still remains good law with respect to the necessity of presenting weight claims to the juvenile court for preservation, and, because J.B. did not file a post-dispositional motion presenting the claim, even though optional, his claim is waived.

The Commonwealth further distinguishes In re D.S. on the grounds that a sufficiency of the evidence claim has a constitutional dimension, as any conviction which is not supported by legally sufficient evidence violates the convicted individual's

due process rights under the Fourteenth Amendment. By contrast, according to the Commonwealth, there is no similar constitutional concern implicated in a weight of the evidence claim. Additionally, the Commonwealth points out J.B. is currently detained in a secure facility so he could seek relief for waiver of his claim by filing a petition for a writ of habeas corpus, whereas the juvenile in In re D.S. could not. Finally, the Commonwealth notes that a weight of the evidence claim does not involve a pure question of law, but, rather, challenges the trial court's exercise of discretion; hence, in its view, it logically follows there must first be a decision of the trial court in which it exercised its discretion by ruling on the weight of the evidence, so that an appellate court may review it.

The Commonwealth also rejects the suggestion that a weight of the evidence claim may be raised in a closing argument, as that would conflict with the well-settled principle of law that an issue may not be raised at any other time than as established by law, and that, pursuant to In re R.N., a post-dispositional motion is the proper way to preserve a weight of the evidence claim, analogous to the filing of a post sentence motion to preserve a weight of the evidence claim in a criminal matter. Further, the Commonwealth highlights the different purposes served by a closing argument and a motion relating to the weight of the evidence. In the Commonwealth's view, a closing argument is undertaken to convince the fact-finder to make an initial determination in favor of the arguing party, based on the evidence of record and suggested credibility determinations; whereas, a post-hearing motion asks the trial judge to examine the record and determine whether a prior determination offends the court's sense of justice. The Commonwealth argues that to judicially allow a closing argument to substitute for a post-decisional motion, as the Superior Court has done, would be an exercise in procedural rulemaking which usurps our Court's authority to exclusively promulgate

rules governing juvenile court procedure pursuant to Article V, Section 10 of the Pennsylvania Constitution. In sum, the Commonwealth contends that J.B. never presented his claim to the juvenile court, and that, consequently, we should find it waived.

J.B. responds by asserting that the three reasons given by our Court in In re D.S. for not finding the juvenile's sufficiency of the evidence claim waived are equally applicable to his case, and they also support a similar finding that his weight of the evidence claim was not waived. Echoing the rationale of the Superior Court decision below, he argues that the filing of a post-dispositional motion was optional in his case; finding his claim waived would cause a harsher result than for a similarly-situated adult defendant, and the juvenile court addressed his weight of the evidence claim in its Pa.R.A.P. 1925(a) opinion so there is no impediment to appellate review. J.B. avers that the Commonwealth's attempt to distinguish In re D.S. on the grounds that it involved the sufficiency of the evidence is unavailing since "each [of these cases] deals with [the] juvenile court process and the constitutional right to due process more generally, and not with the type of appeal brought before this court." Appellee's Brief at 15.

J.B. argues that, even under the holding of In re R.N., his claim is not waived, inasmuch as all that case requires for a juvenile litigant to avoid a finding of waiver of a particular issue is that the juvenile has raised the issue to the juvenile court. J.B. maintains that he did raise his weight of the evidence issue to the juvenile court during the adjudication in his closing argument, and that post-dispositional motions are, by the terms of Pa.R.J.C.P. 620, merely optional. J.B. urges we not render the commands of that rule moot by endorsing the Commonwealth's view that a post-dispositional motion

is required, even when, as here, a weight of the evidence claim is otherwise raised to the juvenile court.

## IV. Analysis

The question of whether J.B. waived appellate review of his weight of the evidence claim is a question of law, and, accordingly, our standard of review is plenary. Pocono Manor Investors, LP v. Pennsylvania Gaming Control Bd., 927 A.2d 209, 216 (Pa. 2007). Further, "[t]he general rule in this Commonwealth is that a weight of the evidence claim is primarily addressed to the discretion of the judge who actually presided at trial." Armbruster v. Horowitz, 813 A.2d 698, 702 (Pa. 2002); Commonwealth v. Edwards, 903 A.2d 1139, 1148 (Pa. 2006). In reviewing a trial court's adjudication of a weight of the evidence claim, "an appellate court determines whether the trial court abused its discretion based upon review of the record; its role is not to consider the underlying question in the first instance." Commonwealth v. Blakeney, 946 A.2d 645, 653 (Pa. 2008). Thus, a weight of the evidence claim must be presented to the trial court so that it may address it in the first instance. Commonwealth v. Widmer, 689 A.2d 211, 212 (Pa. 1997). See also Commonwealth v Karkaria, 625 A.2d 1167, 1170 n.3 (Pa. 1993) ("An allegation that the verdict is against the 'weight' of the evidence is a matter to be resolved by the trial court.").

Once a weight of the evidence claim has been presented to the trial court, it then reviews the evidence adduced at trial and determines whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Clay, 64 A.3d at 1055. A trial court should award a new trial if the verdict of the fact finder "is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." Id. Stated another way, "[a] weight of the

evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." Commonwealth v. Lyons, 79 A.3d 1053, 1067 (Pa. 2013). These principles have been deemed equally applicable to the adjudication of weight of the evidence challenges brought in juvenile court proceedings. McElrath v. Commonwealth, 592 A.2d 740, 745 (Pa. Super. 1991).

Consequently, in order for J.B.'s weight of the evidence claim to have been preserved for appellate review, he needed to present the claim in some manner to the juvenile court so that it could adjudicate it in the first instance. It is uncontested that J.B. did not file a post-dispositional motion raising this claim, although post-dispositional motions are deemed optional under Pa.R.J.C.P. 620. Further, we agree with the Commonwealth that J.B. could not raise a weight of the evidence challenge in his closing argument. In the context of a juvenile matter, a weight of the evidence claim may not be raised via closing argument, inasmuch as it is a matter of plain logic that a claim that an adjudication of delinquency is against the weight of the evidence presupposes that the juvenile court has *already* made such a final adjudication. Closing argument by a juvenile in a delinquency proceeding, which takes place prior to final adjudication, is geared towards convincing the trier of fact that the evidence adduced at the hearing does not prove, beyond a reasonable doubt, that the juvenile was delinquent of the criminal offenses charged. By contrast, a weight of the evidence challenge in a juvenile matter assumes the evidence was sufficient to adjudicate the juvenile delinquent beyond a reasonable doubt, but asks the juvenile court to reassess its adjudication to determine whether certain facts of record are so weighty that they warrant the grant of a new adjudication hearing.

J.B. did, however, present his weight of the evidence claim to the juvenile court in his Pa.R.A.P 1925(b) statement. The question, then, is whether this manner of presentation, coupled with the fact that the juvenile court ruled on it in its Pa.R.A.P. 1925(a) opinion, sufficiently preserved his claim for appellate review. The Juvenile Rules of Court Procedure do not, at present, specify how a juvenile who has been adjudicated delinquent must present a weight of the evidence claim to the juvenile court so that the claim is preserved for appellate review. However, in a procedurally identical matter, our Court, in <u>Widmer</u>, <u>supra</u>, addressed, in the context of criminal proceedings, a similar gap in the procedural rules governing presentation and appellate review of a weight of the evidence claim. Therein, our Court unanimously refused to find a criminal defendant's weight of the evidence claim waived where it was raised in the defendant's statement of matters complained of on appeal and ruled on by the trial court. Principles of fundamental fairness and equal administration of justice demand that we treat J.B.'s case in the identical manner.

By way of background, prior to 1994, in order to preserve any issue for appellate review, a criminal defendant had to present the issue to the trial court in a written post-verdict motion. See, e.g., <u>Commonwealth v. Metz</u>, 633 A.2d 125, 127 (Pa. 1993). In 1994, the Rules of Criminal Procedure were amended to make such motions optional, which allowed a defendant, once his or her judgment of sentence became final, to bypass the filing of such motions altogether and proceed immediately to file a direct appeal. To achieve this result, Pa.R.Crim.P. 1410, now renumbered as Pa.R.Crim.P. 720, was promulgated by our Court and became effective January 1, 1994. This rule provided, in relevant part, that a defendant retained the right to make an optional post-sentence motion after a verdict of guilty had been rendered and sentence pronounced, but that "[i]ssues raised before or during trial shall be deemed preserved for appeal

whether or not the defendant elects to file a post-sentence motion on those issues." Pa.R.Crim.P. 1410(B)(1)(c). However, neither that rule, nor any other Rule of Criminal Procedure, required the filing of a post-sentence motion to present a weight of the evidence claim to the trial court, so that it could consider the claim in the first instance. The rules were altogether silent on this subject, even though "challenges to the weight of the evidence can never be raised 'before or during trial'; rather such challenges can only be raised *after* trial." Widmer, 689 A.2d at 213 (Cappy, J., concurring) (emphasis original). Thus, the criminal rules offered no clear guidance on how to present a claim challenging the weight of the evidence to the trial court, so that the trial court's exercise of discretion in ruling on the claim could be reviewed by an appellate court. See, e.g., Commonwealth v. Brown, 648 A.2d 1177 (Pa. 1994) (requiring that a weight of the evidence claim be presented to the trial court in the first instance, and clarifying that appellate review of a weight of the evidence claim is limited to review of the trial court's exercise of discretion in deciding the claim presented to it).

In Widmer, following his conviction for rape, the defendant did not file post-sentence motions, but, instead, as permitted by former Pa.R.Crim.P. 1410, immediately took a direct appeal to the Superior Court. In his Pa.R.A.P. 1925(b) statement, he challenged the weight of the evidence. The trial court addressed the claim in its Rule 1925(a) opinion and found that the verdict was contrary to the weight of the evidence, but noted that it was deprived of jurisdiction to take any further action due to the appeal. On appeal, the Superior Court did not review the trial court's ruling on the weight of the evidence claim; instead, it found that the defendant had waived appellate review of the claim by failing to raise it in the trial court. Our Court granted allowance of appeal to consider the impact of Pa.R.Crim.P. 1410(B)(1)(c) on this finding of waiver.

In a unanimous opinion, our Court reversed. Highlighting the fact that the defendant raised his weight of the evidence claim in his Pa.R.A.P. 1925(b) statement, we emphasized that this was not a case where the defendant failed to present the claim to the trial court in the first instance, and, as a result, there was "no need for the Superior Court to review a cold record and make an initial determination concerning the weight of the evidence." Widmer, 689 A.2d at 212. Consequently, we deemed it error for the Superior Court "to rule that [the defendant's] failure to file a post-sentence motion for a new trial had the effect of waiving his claim that the verdict was contrary to the weight of the evidence." Id. Accordingly, we remanded the case to the trial court to permit the defendant to file, *nunc pro tunc*, a motion challenging the weight of the evidence and seeking a new trial on that basis.

Then-Justice Cappy concurred, observing that "fairness dictates that the instant case be remanded to the trial court and [the defendant be] permitted to file a motion for a new trial *nunc pro tunc* challenging the weight of the evidence." Id. at 213 (Cappy, J., concurring). However, Justice Cappy also suggested the Criminal Procedural Rules Committee address this "clear void" in the rules and propose remedial amendments to clarify that weight of the evidence claims must be raised first in the trial court, or else be deemed waived. Id. His sense of urgency was compelled by his prediction that there would be instances where a weight of the evidence challenge raised in a Pa.R.A.P. 1925(b) statement would either be reviewed in a cursory fashion by the trial court in its Rule 1925(a) opinion, or not addressed at all. Id. In Justice Cappy's view, "given the language of [former] rule 1410 as it now stands, a defendant caught in those circumstances should not be denied his or her right to challenge the weight of the evidence." Id.

Towards this end, eight months after <u>Widmer</u> was decided, our Court promulgated Pa.R.Crim.P. 1124A, now renumbered as Pa.R.Crim.P. 607. This rule provides:

**Rule 607.  Challenges to the Weight of the Evidence**

(A)     A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:

(1)     orally, on the record, at any time before sentencing;
(2)     by written motion at any time before sentencing; or
(3)     in a post-sentence motion.

Pa.R.Crim.P. 607.  Consequently, in criminal proceedings, this rule eliminates any uncertainty regarding how a weight of the evidence claim is to be presented to the trial court by providing that it must be raised either orally or by written motion before sentencing, or by written motion after sentencing.  The comment to the rule also specifically warns litigants of the consequence of waiver of appellate review if these procedures are not followed.  <u>See</u> Pa.R.Crim.P. 607, Comment ("The purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived.").

Like the Rules of Criminal Procedure at issue in <u>Widmer</u>, the current Rules of Juvenile Court Procedure — which "govern delinquency proceedings in all courts"[20] — are utterly silent as to how a weight of the evidence claim must be presented to the juvenile court so that it may rule on the claim in the first instance, which is, as discussed above, a necessary prerequisite for appellate review.  Further, Pa.R.J.C.P. 620(A)(2), which governs the filing of what it expressly designates as an "optional post-

---

[20]  Pa.R.J.C.P. 100(A).

dispositional motion," uses language nearly identical to that of former Pa.R.Crim.P. 1410(B)(1)(c), which stated, "[i]ssues raised before or during trial shall be deemed preserved for appeal whether or not the defendant elects to file a post-sentence motion on those issues." See Pa.R.J.C.P. 620(A)(2) ("Issues raised before or during the adjudicatory hearing shall be deemed preserved for appeal whether or not the party elects to file a post-dispositional motion on those issues.").

As a result, J.B., just as the defendant in Widmer, faced procedural rules that made optional the filing of a post-dispositional motion, and which did not otherwise specify how a weight of the evidence claim was to be presented in the first instance to the juvenile court in order to preserve it for appellate review. Also, as did the defendant in Widmer, J.B. presented his weight of the evidence claim to the lower court by raising it in his Pa.R.A.P. 1925(b) statement, in which he comprehensively set forth specific reasons why, in his view, the juvenile court's adjudication was against the weight of the evidence.

Just as the trial court did in Widmer, the juvenile court here considered J.B.'s weight of the evidence claim, and then ruled on it in its Rule 1925(a) opinion. We must, therefore, treat J.B.'s weight of the evidence claim in the same manner as we did the defendant's claim in Widmer, in other words, find that it is not waived and remand this case to allow J.B. to file a post-dispositional motion *nunc pro tunc* seeking a new adjudication hearing on the grounds that his adjudication of delinquency was against the weight of the evidence. Principles of fundamental fairness and equal administration of justice demand that such similarly-situated litigants be treated in the same fashion. See, e.g., Commonwealth v. Castillo, 888 A.2d 775, 779 (Pa. 2005) (refusing to

interpret Pa.R.A.P. 1925(b) in a manner that would "yield unsupportable distinctions between similarly situated litigants."); Commonwealth v. Marshall, 810 A.2d 1211, 1230 (Pa. 2002) (Castille, J., concurring and dissenting). ("[T]he most dire circumstance that can characterize a high Court's appellate jurisprudence: an inconsistent approach to similarly-situated litigants.").

Indeed, the approach we took in Widmer is even more justified in the instant matter because this is a juvenile proceeding. As our Court emphasized in In re D.S., and as the Superior Court panel recognized below, a finding of waiver in juvenile proceedings has a harsher consequence for a juvenile than a similarly-situated criminal defendant, inasmuch as if a "claim is found to be waived on appeal, the juvenile cannot raise such a challenge under the [PCRA] because that act does not, by its terms, apply to juvenile proceedings." Id. at 973. Thus, the absence of that avenue of collateral relief for J.B. provides a stronger reason to decline to impose waiver in this matter.

In sum, because we conclude that finding J.B.'s weight of the evidence claim to be waived under these circumstances would be manifestly unjust — a state of affairs our Court recognized in Widmer was unacceptable — principles of fundamental justice and sound reason counsel that our Court take the same prudent path in the instant matter, and remand this matter to the juvenile court to allow J.B. to file a post-dispositional motion *nunc pro tunc*.[21] [22]

---

[21] Given our resolution of this issue warrants a remand to the juvenile court, we need not address the Commonwealth's remaining argument on appeal that the Superior Court erred in deeming J.B.'s weight of the evidence claim meritorious.

[22] Because this case has highlighted a gap in procedural rules promulgated by our Court, we also direct our Juvenile Court Rules Committee to address as rapidly as feasible appropriate curative amendments.

Order of the Superior Court is vacated, and this matter is remanded to the Lawrence County Court of Common Pleas Juvenile Court for further proceedings consistent with this Opinion. Jurisdiction is relinquished.

Former Justice McCaffery did not participate in the decision of this case.

Mr. Chief Justice Castille and Messrs. Justice Eakin and Baer join the opinion.

Mr. Chief Justice Castille files a concurring opinion.

Mr. Justice Saylor files a concurring and dissenting opinion.

Mr. Justice Stevens files a dissenting opinion.