J-A16034-19

2019 PA Super 233

| IN THE INTEREST OF N.A.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.A.P. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2062 MDA 2018 |

Appeal from the Dispositional Order Entered September 1, 2018
In the Court of Common Pleas of Franklin County Criminal Division at
No(s): CP-28-JV-0000038-2017

BEFORE:   LAZARUS, J., MURRAY, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                    **FILED JULY 31, 2019**

Appellant N.A.P., a minor, appeals from the dispositional order entered by the Court of Common Pleas of Franklin County on September 1, 2018. Appellant argues that the juvenile court erred when it refused to sequester a witness and denied his challenge to the weight of the evidence. After careful review, we affirm.

Appellant was adjudicated delinquent based on allegations that he raped and strangled his girlfriend, N.M., when she was fifteen years old. At the adjudication hearing, the following factual history was developed: N.M. claimed that on January 17, 2017, Appellant and N.M. were arguing in the dining room of Appellant's home about Appellant's ex-girlfriend, C.V. Appellant suggested they continue their argument in his downstairs bedroom so that his grandfather would not hear their conversation.

_____
* Former Justice specially assigned to the Superior Court.

N.M. testified that initially she did not expect Appellant to hurt her as his demeanor was not "mean." Notes of Testimony (N.T.), 6/23/17, at 19. However, N.M. claimed that after she refused to have sex with Appellant, Appellant grabbed her by the neck and "slammed [her] down" on the bed. *Id*. at 20-21. As Appellant's hand was high on her neck near her jawbone, N.M. asserted that she had difficulty breathing, could not speak, and could not escape. *Id*. at 21-23, 36-37.

N.M. explained in detail that Appellant used his right hand to pull her pants down and subsequently used his right hand to hold her right hand down. *Id*. at 22. He then placed his right hand on her neck and pulled her pants down with his left hand. *Id*. N.M. asserted that Appellant forced his penis into her vagina while still holding her neck, only stopping when they heard someone or something downstairs. *Id*. at 22-24.

Thereafter, N.M. ran upstairs and texted her cousin to come pick her up, indicating that it was urgent as she needed to leave. *Id*. at 24. Appellant did not follow N.M. upstairs. *Id*. N.M. waited thirty minutes for her cousin to pick her up, but did not tell her cousin what happened because she was afraid and embarrassed. *Id*. at 25. N.M. later noticed she had bruising on her arm and buttocks, recalled having breathing issues that caused her to wheeze, and felt discomfort in her neck for the next few days. *Id*. at 26-27. N.M. also testified that the attack affected her emotionally, as she experienced depression and problems sleeping and eating. *Id*. at 27-28.

N.M. did not speak with Appellant or initiate any contact with him after the attack. When she saw Appellant in the school hallway, he called her a "rat" and "ugly" in front of his friends. N.T. at 28-29. N.M. did not tell anyone about the attack until February 2017 when she confided in her best friend, her dad, and then her mom. *Id*. at 29-32. N.M. reported the attack and underwent a medical exam and interview at the Over the Rainbow Children's Advocacy Center on February 13, 2017.

N.M. admitted that she did not have a good relationship with Appellant's ex-girlfriend, C.V., because she continued to contact Appellant while he was dating N.M., started "drama and rumors," and attempted to set up N.M. with another male in order to break Appellant and N.M.'s relationship. *Id*. at 35, 61-62, 67-68. In addition, N.M. claimed that she was bullied after the attack and had to transfer schools. *Id*. at 14.

The prosecution presented the expert testimony of Jennifer McNew, a forensic nurse consultant, who has performed over 600 examinations in connection with sexual assault allegations. *Id*. at 77-78. When conducting N.M.'s examination on February 13, 2017, McNew took photos of bruises on N.M.'s left arm and left buttocks. McNew indicated that N.M.'s complaints of neck pain, difficulty breathing, lightheadedness, coughing, and headache were consistent with her claim that pressure had been applied to her neck. *Id*. at 88. McNew reported that N.M. did not exhibit any signs of genital injury, but explained that the absence of a genital injury does not invalidate allegations of sexual assault. *Id*. at 88-92. McNew also acknowledged that N.M. tested

positive for chlamydia and Appellant tested negative for chlamydia, but cited studies proposing that chlamydia in males may resolve itself without any treatment. *Id*. at 88-89, 99-101.

N.M.'s mother, T.D., testified that that her daughter was shaken and devastated when she revealed that she had been raped and strangled. *Id*. at 119-20. T.D. initially represented to the reporting officer, Trooper Courtney Pattillo, that based on N.M.'s statements, that the attack occurred sometime between January 16-18, 2017. *Id*. at 112. T.D. asserted that N.M. never alleged that the assault occurred on January 20. *Id*.

Appellant's mother, S.J., claimed Trooper Pattillo contacted her on February 13, 2017 with the allegations N.M. made against Appellant. *Id*. at 124. When Trooper Pattillo asserted that the alleged date of the attack was January 20, 2017, S.J claimed the attack did not happen as Appellant was out to dinner with her for her mother's birthday. *Id*. at 125-26. S.J. also claimed she picked Appellant up at N.M.'s home on January 19. *Id*. at 129-30. However, she never told this to Trooper Pattillo. *Id*. at 133-36.

Trooper Pattillo was unable to be present for the hearing in this case. Neither party sought to continue the adjudicatory hearing to a later court date in which Trooper Pattillo would be available to appear in this case.

Appellant's grandfather, C.J., testified that he supervises Appellant when Appellant's mother is on work trips. *Id*. at 138-39. Although Appellant's room is in the basement of the home, C.J. claimed that he has never seen Appellant's door closed and can hear what is going on the basement from

upstairs. *Id*. at 140-41. While C.J. indicated that Appellant's friends were required to leave the home by 8:00 p.m., C.J. was not aware of any rule with respect to Appellant having girls in his room. *Id*. at 140.

When specifically asked about Appellant's relationship with N.M., C.J. indicated that he never saw N.M. come up from the basement and act unusual, injured, or upset. *Id*. at 143. Further, C.J. identified his own text messages in which he asked Appellant's mother if he could drop Appellant off at N.M.'s grandmother's home on January 18, 2017. *Id*. at 143-45. C.J. remembered driving Appellant there and seeing him enter the home, but admitted he did not see N.M. on that date. *Id*. at 145-46.

Appellant's ex-girlfriend, C.V., testified that she dated Appellant from April 2016 to December 2016. *Id*. at 150-51. C.V. knew that Appellant and N.M. dated from December 27 until the end of January. *Id*. at 151. Appellant and C.V. got back together on February 2, 2017. *Id*. at 151-52. C.V. admitted that she made N.M. angry when she forwarded Appellant a text message thread between N.M. and another male, M.M. *Id*. at 153-56.

Appellant testified on his own behalf and claimed he did not remember what happened on January 17, 2017. *Id*. at 161. He indicated that he had consensual sex with N.M. three or four times during their relationship, but could not recall the exact dates. *Id*. at 160. Appellant testified to his household rule that his bedroom door had to be open if he was alone with N.M. and his grandfather would sometimes check in with them unexpectedly. *Id*. at 162-63. However, Appellant maintained that he and N.M. had sex in

his bedroom several times and were never caught. *Id*. Appellant also claimed his mother set a strict rule that friends had to leave N.M.'s home by 8 p.m. on a school night. *Id*. at 162.

Appellant indicated that he and N.M. broke up in late January over Snapchat messages. *Id*. at 172-73. Although it was a "bad breakup," Appellant could not recall what led to the breakup. N.T. at 171-73. He indicated the breakup occurred before N.M. came forward with the rape allegations and admitted he and N.M. would fight often over his ex-girlfriend, C.V. *Id*. at 163. Appellant admitted to calling N.M. "chunky," "fat," and a "rat" in front of his friends to make N.M. feel bad after their relationship ended. He admitted to targeting N.M.'s insecurities about her own body specifically to make fun of her. N.T. at 165-66, 169. Appellant admitted that N.M. was bullied after they broke up. *Id*. Appellant asserted that he did not have chlamydia and tested negative on February 16, 2017. *Id*. at 161.

Appellant presented a defense expert, Dr. Lawrence Guzzardi, an emergency room physician, who testified that it would be highly unusual for significant bruising to persist after fourteen days. *Id*. at 191, 193. He further indicated that bruising persisting more than twenty-eight days is highly unusual, but could not say that it would be impossible that bruising would last that long. *Id*. at 193-94. Dr. Guzzardi also questioned N.M.'s testimony as she claimed Appellant grabbed her right arm, but her bruises appeared on her left arm. *Id*. at 196. He was "highly surprised" that N.M. did not report

bruising on her neck based on her description of the assault. N.T. at 199. He also agreed that a lack of genital bruising was not conclusive. *Id*. at 199-200.

Dr. Guzzardi testified that N.M.'s testimony did not suggest that she contracted chlamydia from Appellant as this disease is transmitted by secretion. *Id*. at 201-202. Dr. Guzzardi stated that he was not familiar with cases of chlamydia that resolve without treatment. *Id*. Dr. Guzzardi also questioned N.M.'s account that she was strangled, as he indicated that hoarseness and difficulty breathing would occur if force was exerted lower on the neck than where N.M. reported. *Id*. at 207-208. Dr. Guzzardi indicated that symptoms consistent with N.M.'s account of the assault would include faintness, passing out, and pain; he felt a complaint of wheezing did not make sense. *Id*. Thus, Dr. Guzzardi opined that the physical evidence is not consistent with N.M.'s allegations. *Id*. at 204-205.

The prosecution presented Jennifer McNew as a rebuttal witness. McNew confirmed that N.M. testified consistently with her allegations given in her interview, in which she indicated that Appellant had grabbed her left arm, not her right arm. *Id*. at 218.

At the conclusion of the hearing, the juvenile court adjudicated Appellant delinquent of rape and strangulation and found Appellant in need of treatment, supervision, and rehabilitation. Appellant was placed on probation supervision until further court order and was placed at Adelphi Village, Loyalhanna Home.

Appellant filed a timely appeal and complied with the juvenile court's direction to submit a Concise Statement of Errors Complained of on Appeal

pursuant to Pa.R.A.P. 1925(b). In his 1925(b) statement, Appellant filed a "motion for leave to file post-disposition motion *nunc pro tunc*," raising a challenge to the weight of the evidence for the first time. This Court remanded this case to the juvenile court to provide Appellant with the opportunity to file a post-dispositional motion *nunc pro tunc*. **See In re J.B.**, 630 Pa. 124, 106 A.3d 76 (2014) (remanding the matter to the juvenile court to allow the juvenile to raise a weight claim for the first time in a post-dispositional motion *nunc pro tunc*).

Following remand, Appellant filed a post-dispositional motion seeking a new finding of fact hearing. After allowing the parties to file briefs on this issue, the lower court entered an order and opinion on December 4, 2018, denying Appellant's motion. This timely appeal followed.

Appellant raises the following issues for our review:

1. Whether, after offers of proof that the testimony of [T.D.] could be molded by being present in the courtroom while [N.M] testified, the trial court abused its discretion by denying [Appellant's] request to have [T.D.] sequestered.

2. Whether the weight of the evidence at trial was so greatly against the Commonwealth and in favor of [Appellant] as to warrant a new trial.

Appellant's Brief, at 26.

We first review Appellant's claim that the juvenile court erred in denying his request to sequester T.D. while her daughter N.M. testified. In reviewing a trial court's decision on a request to sequester a witness, we are guided by the following principles:

> The purpose of sequestration is to prevent a witness from molding his testimony with that presented by other witnesses. Because of the practical considerations that attend trials, the decision to sequester witnesses is left to the discretion of the trial judge and will be reversed only for an abuse of discretion.

***Commonwealth v. Counterman***, 553 Pa. 370, 399–400, 719 A.2d 284, 299

(1998) (citations omitted).

> [T]o establish the court's ruling as a basis for a new trial the appellant must demonstrate that the trial court failed to apply the law correctly or acted for reasons of bias or other factors unrelated to the merits of the case. Our scope of review for this analysis is plenary. ***See*** [***Cooper v. Delaware Valley Med. Ctr.,*** 539 Pa. 620, 654 A.2d 547, 553 (1995)].

> Requests for sequestration "should be as specific as possible and supported by reasons aimed at the interests of justice." ***Commonwealth v. Holland***, 480 Pa. 202, 389 A.2d 1026, 1031 (1978). A general request is insufficient. ***See id***. A court does not err simply because it fails to grant an appellant relief for which he does not ask. ***See id***.

***Commonwealth v. Atwell***, 785 A.2d 123, 125–26 (Pa.Super. 2001).

When Appellant's counsel asked for T.D. to be sequestered, he indicated that T.D. was a potential rebuttal witness, but acknowledged that T.D. had not been subpoenaed at that point.[1] The prosecution objected to the sequestration request, arguing that, as the defense had never indicated it planned to call T.D. as a witness, sequestration would take N.M. by surprise

---

[1] The juvenile court pointed out that the finding of fact hearing on the delinquency petition would be open to the public due to the seriousness of the accusations made against Appellant. *See* 42 Pa.C.S.A. § 6336(e)(1) (requiring proceedings open to the general public in cases where the delinquency petition alleges that the "child was 14 years of age or older at the time of the alleged conduct and the alleged conduct would be considered a felony if committed by an adult").

as she was under the impression that her mother would be in the courtroom during her testimony. As T.D. would be the main source of support for N.M. while she testified to the details surrounding her rape allegations, the prosecution asserted that the sequestration of T.D. would make it difficult for N.M. to testify. At that time, the juvenile court ruled that T.D. would be allowed to stay in the courtroom.

Appellant's counsel then asked if the lower court's ruling would be different if he instructed his assistant to obtain a subpoena for T.D. from the clerk of courts across the hall, but indicated that he did not want to be viewed as "petty." N.T. at 7. At that point, the juvenile court viewed counsel's actions as "gamesmanship" and clarified that T.D. would be permitted to remain in the courtroom for N.M.'s testimony and then would be required to leave the courtroom until summoned for her own testimony. *Id*.

Appellant argued that the juvenile court abused its discretion in denying his sequestration request due to the fact that T.D. could mold her testimony after hearing her daughter, N.M. testify. Specifically, Appellant pointed to his theory that there was inconsistency in the victim's allegations of the date when the attack occurred. Appellant noted that after Trooper Pattillo had initially told Appellant's mother that the attack had occurred on January 20, 2017, Appellant's mother confirmed that Appellant had an alibi as he was with her at a restaurant that evening. Appellant alleges that N.M. subsequently changed the date of her allegations to suit her accusations.

While the Commonwealth asserted that the discrepancy in the allegations of the date of the attack would have been resolved had Trooper Pattillo been available to testify at the hearing, it assured the court that it was equally frustrated with his absence, but indicated that officer's appearance was beyond the prosecution's control as it had subpoenaed the officer, who was in Canada on that date.

In reviewing the record in this case, we find Appellant failed to show that the denial of his request to sequester T.D. "resulted in prejudice or contravened the interest of justice." **Counterman**, **supra**. As noted above, at the time Appellant sought to sequester T.D., the defense had not named T.D. as a witness. The defense threatened to subpoena T.D. only after the trial court refused to remove her from the courtroom during N.M.'s testimony.

While the defense argued N.M.'s testimony contained crucial inconsistencies with respect to the date of the attack, counsel did not attempt to elicit any evidence from N.M. to support this claim. On direct examination, N.M. confirmed that the rape and strangulation occurred on January 17, 2017. On cross-examination, defense counsel did not question N.M. at all with respect to the date of the attack or confront N.M. with his theory that N.M. initially told police that the attack occurred on January 20, 2017, but changed her allegations after Appellant's mother gave him an alibi for that date.

In fact, defense counsel actually corroborated N.M.'s testimony as to the date of the attack by admitting screenshots of text messages N.M. sent to her cousin on January 17, 2017, asking urgently for a ride home from Appellant's

residence. As a result, Appellant has not shown the trial court abused its discretion in denying his sequestration request.

Appellant also argues that the juvenile court erred in refusing to grant Appellant a new adjudicatory hearing based on his weight of the evidence claim. Our standard of review is as follows:

> "A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the grounds that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." **In re J.B.,** 630 Pa. 124, 106 A.3d 76, 95 (2014) (citation omitted). Thus, we may reverse the juvenile court's adjudication of delinquency only if it is so contrary to the evidence as to shock one's sense of justice. **In re J.M.,** 89 A.3d 688, 692 (Pa.Super. 2014), *appeal denied,* 628 Pa. 623, 102 A.3d 986 (2014) (citation omitted). Moreover, where the juvenile court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. **Id.** Rather, this Court is limited to a consideration of whether the juvenile court palpably abused its discretion in ruling on the weight claim. **Id.** Hence, a juvenile court's denial of a weight claim is the least assailable of its rulings, as conflicts in the evidence and contradictions in the testimony of any witnesses are for the fact finder to resolve. **Id.**

**In re A.G.C.**, 142 A.3d 102, 109 (Pa.Super. 2016).

Appellant specifically argues that 1) N.M. had a motive to fabricate the rape allegations based on her relationship history with Appellant and Appellant's self-admitted "heinous" bullying tactics, 2) Appellant had no motive to rape N.M., 3) the physical evidence does not support N.M.'s account, 4) Appellant's testimony was "unimpeached," 5) N.M.'s text messages after on the night of the incident do not suggest that she was attacked, and 6) the reported date of the incident "suspiciously changed" based on Appellant's alibi.

However, the juvenile court emphasized that it found N.M. had testified credibly and set forth its findings as follows:

At the finding of fact hearing, N.M. provided a clear and detailed step-by-step account of what occurred on January 17, 2017. She additionally offered details of her physical and emotional state following January 17, 2017. After disclosing the incident to her friends and family in February 2017, N.M. underwent a recorded interview, a medical examination, and a police investigation conducted by Trooper Pat[t]illo. Finally, N.M. stood before the Court at the finding of fact hearing to offer her recollection of the incident.

In contrast to N.M.'s testimony, the juvenile could not recall for the Court what happened on January 17, 2017, and thus did not satisfactorily refute N.M.'s contentions. The juvenile could not remember when or why his relationship with N.M. ended. Moreover, his own testimony did not support his grandfather's and mother's assertions that he was with N.M. on January 18 and 19 of 2017, because the juvenile could not remember what he did on those dates. Instead of providing corroboration, the juvenile merely tendered a Snapchat conversation – undated – that purported to show an angry conversation with N.M. which the juvenile estimated occurred after the break up. Yet again, the juvenile was unable to approximate a date for the Court to consider.

Regarding the juvenile's arguments outlined in his supporting brief, we find that the facts the juvenile points out are not "so weighty that they warrant the grant of a new adjudication hearing." The juvenile's assertions of N.M.'s alleged motive remain unpersuasive. While the juvenile may describe his conduct as "heinous," this Court does not find that the juvenile's treatment of N.M. rises to the level where a high school student would be driven to fabricate criminal charges against a bully. Further, we again observe that the many references to C.V.'s involvement do not support a motive for N.M. to manufacture allegations against the juvenile. With respect to the juvenile's own lack of motive, the absence of a proven motive for offensive conduct is not demonstrable evidence that should have been given greater weight.

Likewise, the juvenile's contention referring to the lack of physical evidence is unpersuasive. As Ms. McNew and the juvenile's expert both testified, the period between the assault on January 17, 2017, and N.M.'s medical examination on February 13, 2017, was sufficient for physical evidence of the assault to fade and disappear. As this Court stated upon finding the juvenile involved, our determination was not based on the bruises noted in the medical examination, but rather on N.M.'s credible description of the incident.

In response to the juvenile's claim that his own testimony was "unimpeached," we note that his testimony provided little substance to impeach.

Finally, the juvenile's assertion concerning the reporting of the assault do not sway our decision. The fact that N.M. did not contact her cousin with the degree of urgency that the juvenile deems fitting under the circumstances is not a fact that merits greater weight. While the juvenile appears to contend that the texts of a sexual assault victim would be more forthcoming about what had happened, the fact remains that N.M.'s messages do convey a sense of urgency and comport with N.M.'s testimony that she was not ready to disclose the assault. Furthermore, while the juvenile points to the change in dates as a suspicious circumstance meant to count the juvenile's alibi, the evidence does not show that either N.M. or [N.M.'s mother] were aware of [Appellant's mother's] statement to Trooper Pat[t]illo that the juvenile was with [her] on January 20, 2017.

Notwithstanding the juvenile's arguments, this Court found – and continues to find – N.M. to be a credible witness. We found her testimony believable despite the juvenile's many attempts to discredit her. Accordingly, after careful review, we decline to reweigh the evidence underlying our initial decision at the finding of fact hearing.

Trial Court Opinion, 12/4/18, at 15-18.

Appellant's weight of the evidence claim simply asks this Court to re-weigh the evidence and substitute our judgment for the juvenile court's credibility determinations. As we noted above, conflicts in the evidence and

- 14 -

contradictions in the testimony of any witnesses are for the fact finder to resolve. **In re A.G.C.**, **supra**. Based on the record in this case, we cannot find that the adjudication of delinquency is so contrary to the evidence as to shock one's sense of justice. Accordingly, we conclude that the juvenile court properly exercised its discretion in ruling on the weight claim.

For the foregoing reasons, we affirm.

Dispositional order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2019