J-S36017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: D.M.S-F.      :    IN THE SUPERIOR COURT OF
                                       :         PENNSYLVANIA
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :
APPEAL OF:  D.M.S-F.           :       No. 369 WDA 2022

Appeal from the Order Entered November 18, 2021
In the Court of Common Pleas of Allegheny County
Juvenile Division at No(s):  CP-02-JV-0001364-2020

BEFORE:   STABILE, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KING, J.:                **FILED: MARCH 29, 2023**

Appellant, D.M.S-F., appeals from the dispositional order entered in the Allegheny County Court of Common Pleas, Juvenile Division, which adjudicated her delinquent for simple assault and recklessly endangering another person ("REAP").[1]  We affirm.

The trial court set forth the facts of this case as follows:

> On the evening of June 17, 2020, the victim's mother took her two girls to visit her own sister's townhouse.  [N.T. Hearing, 11/18/21,] at 23, 25, 75-77.  The sister has a young daughter as well.  *Id.*  At that time, the victim was 7 years old, and her younger sister was 4 years old.
>
> [Appellant], then age 15, was there at the townhouse to babysit for the night.  *Id.* at 24, 76-77, 103.  The victim and her sister asked if they could stay over as well, and the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2701(a)(1) and 2705, respectively.

parents agreed, leaving the three in the care of [Appellant]. *Id.* at 24-25, 76-77. The victim's mother had never known of any problems with [Appellant] in the past. *Id.* at 82. The victim herself had met [Appellant] previously without any difficulties with [Appellant]. *Id.* at 37. The parents left, and the victim's mother had her phone off that night. *Id.* at 80.

[Appellant] acknowledged that during the evening, they played and danced around before eating and going to bed. *Id.* at 26, 111. [Appellant] thought that the victim was "fast for her age. She acted way older than a seven-year-old." *Id.* at 109. By this, [Appellant] meant that while listening to music, the girls "were all shaking their butts" and cursing. *Id.* at 109-10.

The townhouse had a bunk bed, and later, the victim's sister and cousin got into the top bunk and went to sleep. *Id.* at 26. The victim got into the bottom bunk. *Id.* [Appellant] got into the bottom bunk bed with the victim, as [Appellant] later admitted to police. *Id.* at 26, 38-39, 94. The victim had trouble falling asleep because of music playing, but eventually, she went to sleep. *Id.* At that time, the sheets were on the bed. *Id.* at 31-32.

She woke at some point because [Appellant] poured hot water onto what the victim called her "private area." *Id.* at 27. Testimony indicated that [Appellant] used a bowl to pour the water onto the victim as the victim slept. *Id.* at 26-27. The victim woke up, finding this painful. *Id.* at 27. The victim's testimony on her reaction was unclear as she testified that she screamed but did not cry. *Id.* at 27, 31. When she woke up in pain, she saw [Appellant] there with her. *Id.* In court, the victim identified [Appellant] as the person she saw and who caused the injury. *Id.* at 35-36.

The victim saw that the sheets were no longer on the bed the way they had been at bedtime. *Id.* at 32. [Appellant] got back into the bed with the victim and told her not to tell anybody about the events. *Id.* at 28, 30. Later, [Appellant] told the police that the sheets were in such disarray because she "sleeps wild." *Id.* at 94.

That night, the victim tried to call her mother using her cousin's phone, but her mother did not answer. *Id.* at 28-

29. Later that week, a Penn Hills police detective checked the cousin's phone and saw that there were in fact two attempted calls to the victim's mother. *Id.* at 91-92.

When the victim's aunt came home toward morning, the aunt was angry that the room was messy because it had been orderly when the aunt had gone out. *Id.* at 31. The aunt returned the victim and her sister to their home with their mother. *Id.* at 78.

The victim had trouble walking because she said that it hurt. *Id.* at 34. Nonetheless, she did not tell anyone what happened; she explained: "I got scared if I thought it was going to get anyone in trouble." *Id.* at 34, 39 (she also said she did not want to make her aunt any angrier because of the messy room). Further, the victim had no experience of this kind, never having had a burn, or blisters from a burn, before. *Id.* at 39.

The victim's mother noticed that the victim was subdued, lying around that day and walking oddly; the mother thought maybe the victim had a cramp. *Id.* at 80. The victim denied that anything was wrong. *Id.* at 82. Then, the next day, the victim's sister informed the mother that the victim had a burn in her private area. *Id.*

[The victim's m]other looked down her daughter's pants and saw the burns. *Id.* at 80. The victim told her mother what happened. *Id.* at 34-35. The victim's mother took photos of the injuries and confronted [Appellant's] mother, who denied any wrongdoing by [Appellant]. *Id.* at 83.

The victim's mother also took the child to the hospital. *Id.* at 34-35, 81.

Kathleen Roth is a physician assistant ("PA") who was on duty at Mercy Hospital's emergency room on June 19, 2020, when the victim and her mother were sent from Children's Hospital, where they first went, because Mercy Hospital has a burn center. *Id.* at 58-64. The PA examined the girl and observed blistering burns on the child's inner thigh, suprapubic region and around her genitalia. *Id.* at 60-61. The PA concluded that the injury was strongly indicative of a non-accidental trauma. *Id.* at 62. The PA credibly

testified that "the appearance of the burns did appear consistent with a partial thickness burn secondary to most likely a hot liquid, hot water being a strong possibility." *Id.* at 61. There were no chemical or oily substances present that led her to think otherwise. *Id.* at 61-62. She explained that burns progress, and blisters develop[.] *Id.* at 62. She estimated that the injury would have occurred within one to three days, but most likely within 48 hours judging by the amount of time that it takes for blisters to form and then begin leaking fluid. *Id.* at 62-63.

The PA also observed the victim's mother and determined that "mother seems appropriately concerned." *Id.* at 64. She diagnosed the child as having genital burns secondary to a hot liquid with a concern for child abuse. *Id.* at 64. The protocol at the hospital was to send anyone with a "significant burn" to the Hydrotherapy Unit at the hospital's burn unit. *Id.* at 64-65. The PA explained that a partial thickness burn is what was called a second-degree burn, and these burns could be caused by tap water if the water was hot enough, a phenomenon she had seen previously in her career. *Id.* at 64-65. She also took photos. *Id.* at 67.

The PA documented the burns as "blister burns to the pubic majora, which is kind of the external genitalia region, as well as the inner thigh and the suprapubic region, which is just kind of encroaching above the labia there" and which were a "partial thickness burn with blistering inflammation" with a portion "traveling back towards the rectal opening…." *Id.* at 68.

The PA did not find it unusual that there was a delay of a day between the burning and the hospital visit. *Id.* at 72. [Appellant's] attorney confronted the PA with a document from a Child Advocacy Center containing a statement by a forensic interviewer indicating it was unclear how the injury pattern would have resulted from the history, but the PA held firm to her prior testimony that "the burn and history pattern matched." *Id.* at 72-73. [Appellant] did not call the author of the written statement to testify.

(Trial Court Opinion, 5/25/22, 2-5) (unnecessary capitalization omitted).

On November 18, 2021, the trial court held an adjudicatory hearing.

After the hearing, the trial court found Appellant delinquent of simple assault and REAP. The court placed Appellant on probation until further order of court.

Following the entry of new counsel for Appellant, on December 10, 2021, Appellant filed a motion to reinstate her post-dispositional motion rights *nunc pro tunc*. On December 16, 2021, the court granted the motion. The court expressly permitted Appellant to file the post-dispositional motion within 30 days after the court reporter filed the transcript from the adjudicatory hearing. The transcript was filed on January 10, 2022. On February 9, 2022, Appellant filed a timely post-dispositional motion for reconsideration. After a hearing on March 1, 2022, the court denied relief. Appellant filed a timely notice of appeal on March 29, 2021. On April 4, 2022, the court ordered Appellant to file a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(b). Appellant complied and timely filed her concise statement on April 21, 2022.

Appellant raises the following questions:

> 1. Whether the evidence presented by the Commonwealth was insufficient to establish the elements of each adjudicated crime beyond a reasonable doubt and sustain the adjudication of delinquency on all…counts?
>
> 2. Whether the evidence presented at trial by the Commonwealth was insufficient as a matter of law to sustain an adjudication of delinquency for [REAP].
>
> 3. Whether the adjudication of delinquency of Simple Assault…and [REAP]…was against the weight of the evidence?

(Appellant's Brief at 3) (questions reordered for ease of disposition; unnecessary capitalization omitted).

- 5 -

Our standard of review is well settled: "The Juvenile Act grants broad discretion to juvenile courts in determining appropriate dispositions. In addition, this Court will not disturb the juvenile court's disposition absent a manifest abuse of discretion." *In Int. of J.G.*, 145 A.3d 1179, 1184 (Pa.Super. 2016) (citations omitted).

In her first claim, Appellant challenges the sufficiency of the evidence underlying her adjudication of delinquency as to each offense, arguing that the Commonwealth failed to prove that Appellant was the person who committed the crimes beyond a reasonable doubt. Appellant claims that the evidence was so weak and insubstantial that it raises significant reasonable doubt as to whether Appellant was the perpetrator of the acts against the victim. She notes that the victim was asleep during the incident and did not see Appellant pour hot water on her. Appellant argues that there was no physical evidence from the scene corroborating the victim's story, and no other witness saw Appellant assault the victim. Furthermore, Appellant argues that the delay in reporting the injuries gives rise to reasonable doubt as to when the injuries occurred and whether the injuries happened while the victim was in the care of Appellant. Accordingly, Appellant asserts that the evidence was insufficient to establish her identity as the perpetrator. We disagree.

This Court has explained:

> When a juvenile is charged with an act that would constitute a crime if committed by an adult, the

Commonwealth must establish the elements of the crime by proof beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth. In determining whether the Commonwealth presented sufficient evidence to meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.

The facts and circumstances established by the Commonwealth need not be absolutely incompatible with a defendant's innocence. Questions of doubt are for the hearing judge, unless the evidence is so weak that, as a matter of law, no probability of fact can be drawn from the combined circumstances established by the Commonwealth.

*In re V.C.*, 66 A.3d 341, 348–349 (Pa.Super. 2013)[, *appeal denied*, 622 Pa. 762, 80 A.3d 778 (2013)] (quoting *In re A.V.*, 48 A.3d 1251, 1252-1253 (Pa.Super. 2012)). The finder of fact is free to believe some, all, or none of the evidence presented. *Commonwealth v. Gainer*, 7 A.3d 291, 292 (Pa.Super. 2010)[, *appeal denied*, 611 Pa. 631, 23 A.3d 1055 (2011)].

*Int. of J.G., supra* at 1888.

The crime of REAP is defined as follows:

A person commits a misdemeanor of the second degree if [s]he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S.A. § 2705. The Crimes Code further sets forth that a person is

guilty of simple assault if she "attempts to cause or intentionally, knowingly

- 7 -

or recklessly causes bodily injury to another[.]" 18 Pa.C.S.A. § 2701(a)(1).

Instantly, the trial court explained that it found the PA's testimony to be credible and reliable. The PA gave a timeline for the injury based on blistering for the burn, and this testimony supported the timeline of the injury occurring while the victim was under Appellant's care. The court noted that the PA testified that delay in reporting the injury is common. Additionally, as the court noted, "the [v]ictim identified [Appellant] as the perpetrator and testified very credibly that she woke to the hot water in her genital area and that [Appellant] had committed this act." (Trial Court Opinion at 11). Hence, the court found the evidence sufficient to establish that Appellant was the perpetrator.

As we noted above, the court was free to believe all, part, or none of the evidence, and we must defer to the court's credibility determinations. Thus, when this evidence is viewed in a light most favorable to the Commonwealth, it was sufficient to establish beyond a reasonable doubt that Appellant poured the hot water on the victim and caused burns to her genitalia. Consequently, Appellant's first issue merits no relief.

In her next argument, Appellant contends that the evidence was insufficient as a matter of law to sustain her adjudication of delinquency for REAP because there was no evidence of serious bodily injury. Appellant argues that the injuries themselves did not constitute serious bodily injury as they were not life threatening and there was no evidence adduced that the

victim was receiving ongoing medical treatment or had permanent scaring or loss of function. Appellant further insists that the Commonwealth failed to prove that she would know the risk of harm that could be inflicted by pouring hot water onto someone. Therefore, Appellant claims the evidence was insufficient as a matter of law to sustain the adjudication of delinquency for REAP. We disagree.

Serious bodily injury supporting a conviction for REAP is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301.

The term "recklessly," as used in 18 Pa.C.S.A. § 2705, is defined as follows:

> A person acts recklessly with respect to a material element of an offense when [s]he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from h[er] conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to h[er], its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3).

Here, in finding sufficient evidence to prove that the victim suffered serious bodily injury and that Appellant intentionally or recklessly caused the injury, the court stated:

> Pouring water hot enough to inflict blistering, second-degree burns on the sensitive genital area of a child easily

- 9 -

constitutes conduct that places a child in danger of serious or protracted impairment of the function of genital area. In fact, the victim had trouble walking normally beyond the immediate aftermath of the burning.

Moreover, the victim did not have a simple or small burn. The medical testimony resulted in a diagnosis of second-degree burns that triggered hospital protocol to send her to a treatment area where "significant burn[s]" were addressed. [N.T. Hearing] at 64-65. As discussed above, the PA documented "blister burns to the pubic majora, which is kind of the external genitalia region, as well as the inner thigh and the suprapubic region, which is just kind of encroaching above the labia there" and emphasized that they were a "partial thickness burn with blistering inflammation" with a portion "traveling back towards the rectal opening…." *Id.* at 68.

Based on the testimony, the act was reckless, created significant injury and placed the child at risk of protracted harm….

(Trial Court Opinion at 11-12) (unnecessary capitalization omitted).

Upon review, we conclude that in considering the totality of the circumstances, the court, as fact-finder, could infer that Appellant recklessly created a substantial risk of serious bodily injury to the victim. A reasonable person would recognize the substantial risk of serious bodily injury created by pouring burning hot water on a child's genitalia. Here, Appellant disregarded this risk and poured hot water on the victim causing second-degree burns throughout the victim's genitalia. The victim's burns were severe enough to require treatment at the hospital's burn unit. We agree with the trial court that this act was reckless, caused significant injury, and placed the child at

risk of serious bodily injury and protracted harm. Appellant's second issue merits no relief.

In her third issue, Appellant challenges the weight of the evidence, arguing that the adjudications of simple assault and REAP were against the weight of evidence presented at trial. Specifically, she contends that the victim was asleep during key moments of the incident, and that there was no physical evidence corroborating the victim's testimony. Appellant claims the victim's testimony lacked specificity and was not credible; therefore, the trial court abused its discretion in relying on that testimony to make its adjudication. Finally, Appellant argues that the court's reliance on the medical testimony of the PA was misplaced because the medical conclusions were influenced by the history provided by the victim. Accordingly, Appellant insists she is entitled to a new trial. We disagree.

Regarding weight of the evidence claims:

> This Court applies the same standard for reviewing weight of the evidence claims in juvenile cases as those involving adults. *In re R.N.*, 951 A.2d 363, 370 (Pa.Super. 2008). An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. *Commonwealth v. Ramtahal*, 613 Pa. 316, 33 A.3d 602 (2011). "An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence." *Id.* at 327-28, 33 A.3d at 609. Moreover, a court's denial of a motion for a new trial based upon a weight of the evidence claim is the least assailable of its rulings. *Commonwealth v. Rivera*, 603 Pa. 340, 363, 983 A.2d 1211, 1225 (2009).

*In Int. of J.G., supra* at 1187 (citation formatting provided).

- 11 -

"A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the grounds that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." ***In re J.B.***, 630 Pa. 124, 106 A.3d 76, 95 (2014) (citation omitted). Thus, we may reverse the juvenile court's adjudication of delinquency only if it is so contrary to the evidence as to shock one's sense of justice. ***In re J.M.***, 89 A.3d 688, 692 (Pa.Super. 2014), *appeal denied*, 628 Pa. 623, 102 A.3d 986 (2014) (citation omitted). Moreover, where the juvenile court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. ***Id.*** Rather, this Court is limited to a consideration of whether the juvenile court palpably abused its discretion in ruling on the weight claim. ***Id.*** Hence, a juvenile court's denial of a weight claim is the least assailable of its rulings, as conflicts in the evidence and contradictions in the testimony of any witnesses are for the fact finder to resolve. ***Id.***

***Int. of N.A.P.***, 216 A.3d 330, 336 (Pa.Super. 2019) (quoting ***In re A.G.C.***, 142 A.3d 102, 109 (Pa.Super. 2016)).

Instantly, the court explained:

…As observed at the conclusion of the hearing, this [c]ourt was convinced that the victim understood the concept of truthfulness after discussing this concept with the victim. [N.T. Hearing] at 19-20. The victim seemed very credible to the [c]ourt about an event that would be memorable. ***Id.*** at 115. The child had no previous negative relationship with [Appellant] that would motivate the child to lie. ***Id.*** On the other hand, [Appellant] said little, and her testimony consisted primarily of an unconvincing denial of the act with a brief description of the evening in question. ***Id.*** at 105-12.

While the victim's testimony contained some inconsistencies or unclear portions, her overall testimony was clear that she woke up in the night burned by water, and that [Appellant] was there with her and was the perpetrator. The victim testified that [Appellant] said not to tell anyone. The

- 12 -

identification was clear.  Moreover, the victim's testimony combined with the very credible testimony of the PA to convince the court of the elements of the crime beyond a reasonable doubt.  *Id.*

\*   \*   \*

[Appellant] also argues that the court gave too much weight to the testimony of the PA rather than a forensic interviewer and additionally that the delay in taking the victim to the hospital and in the subsequent police investigation raises reasonable doubt about [Appellant's] responsibility.  However, the PA's testimony was detailed, and the witness struck the court as impartial, knowledgeable, and believable.  Notably, [Appellant's] contention rests on a sentence in a report written by an individual who did not testify, and the sentence states that it is "unclear" how the injury resulted from the mechanism.  *See* [*id.*] at 72-73.  It was used on cross-examination to attempt to impeach the witness, but the PA was resolute in her own assessments when confronted with it.  *Id.*

Lastly, contrary to [Appellant's] representations, there was some corroboration in the case in that the police investigation supported the victim's testimony about trying to phone her mother, and the PA's testimony supported the victim's statement about how the injury occurred.

For these reasons, the invitation to re-weigh the witness's credibility and resolve the purported inconsistency should be declined.

(Trial Court Opinion at 8-9) (unnecessary capitalization omitted).

Here, Appellant essentially asks us to reassess the credibility of the victim and reweigh the evidence presented.  We decline to do so.  *See Int. of J.G., supra*.  It was for the court, as fact-finder, to determine the credibility of the witnesses and the weight to be accorded to their testimony.  The testimony of the victim, which the court credited, supports the court's

- 13 -

adjudication of delinquency, and the adjudication does not shock one's sense of justice. **See Int. of N.A.P., supra**. Accordingly, we conclude that the trial court did not abuse its discretion in rejecting Appellant's weight of the evidence claim. Appellant's third issue is meritless. Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/29/2023